No. 22-1786

—————————————————————

United States Court of Appeals
For the Seventh Circuit

—————————————————————

| | |
|---|---|
| A.C., a minor child by his next friend,<br>mother and legal guardian, M.C., | ] |
| | ] |
| | ] |
| Plaintiff-Appellee, | ] |
| | ] |
| v. | ] |
| | ] |
| METROPOLITAN SCHOOL DISTRICT OF, | ] |
| MARTINSVILLE, and PRINCIPAL, | ] |
| JOHN R. WOODEN MIDDLE SCHOOL, | ] |
| in his official capacity, | ] |
| | ] |
| Defendants-Appellants. | ] |

—————————————————————

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division
No. 1:21-cv-2965-TWP-MPB, The Honorable Tanya Walton-Pratt, Chief Judge

—————————————————————

**APPELLANTS' BRIEF
AND SHORT APPENDIX**

—————————————————————

Philip R. Zimmerly
  – COUNSEL OF RECORD
Jonathan L. Mayes
Mark A. Wohlford
BOSE MCKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
(317) 684-5000

*Counsel for Appellants*

**ORAL ARGUMENT REQUESTED**

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1786

Short Caption: A.C. v. Principal, John R. Wooden Middle School, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Metropolitan School District of Martinsville; Principal, John R. Wooden Middle School, his official capacity

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Bose McKinney & Evans LLP by Philip R. Zimmerly, Jonathan L. Mayes, and Mark Wohlford

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        none

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        none

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Philip R. Zimmerly      Date: May 6, 2022

Attorney's Printed Name: Philip R. Zimmerly

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [✔]  No [ ]

Address: 111 Monument Circle, Suite 2700

Indianapolis, IN 46204

Phone Number: 317-684-5116      Fax Number: 317-684-0116

E-Mail Address: pzimmerly@boselaw.com

rev. 12/19 AK

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1786

Short Caption: A.C. v. Principal, John R. Wooden Middle School, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Metropolitan School District of Martinsville; Principal, John R. Wooden Middle School, his official capacity

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Bose McKinney & Evans LLP by Philip R. Zimmerly, Jonathan L. Mayes, and Mark Wohlford

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Jonathan L. Mayes      Date: May 9,  2022

Attorney's Printed Name: Jonathan L. Mayes

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐   No ☑

Address: 111 Monument Circle, Suite 2700

Indianapolis, IN 46204

Phone Number: 317-684-5245      Fax Number: 317-684-0245

E-Mail Address: jmayes@boselaw.com

rev. 12/19 AK

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1786

Short Caption: A.C. v. Principal, John R. Wooden Middle School, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
        Metropolitan School District of Martinsville; Principal, John R. Wooden Middle School, his official capacity

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
        Bose McKinney & Evans LLP by Philip R. Zimmerly, Jonathan L. Mayes, and Mark Wohlford

(3)     If the party, amicus or intervenor is a corporation:

        i)        Identify all its parent corporations, if any; and
                  none

        ii)       list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
                  none

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
        N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
        N/A

Attorney's Signature: /s/ Mark A. Wohlford          Date:  May 9, 2022

Attorney's Printed Name:   Mark A. Wohlford

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☐     No ☑

Address:  111 Monument Circle, Suite 2700

          Indianapolis, IN 46204

Phone Number:  317-684-5252          Fax Number:  317-684-0252

E-Mail Address: mwohlford@boselaw.com

rev. 12/19 AK

**iv**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................... vii

JURISDICTIONAL STATEMENT ................................................. 1

STATEMENT OF THE ISSUE .................................................... 1

STATEMENT OF THE CASE ...................................................... 2

    I.  Factual Background ........................................................ 2

    II. Procedural Background .................................................. 6

SUMMARY OF THE ARGUMENT .............................................. 7

STANDARD OF REVIEW ......................................................... 9

ARGUMENT ............................................................................ 9

    I.  A.C.'s Demand to Use the Boys' Restrooms is Not Supported by Title IX or the Equal Protection Clause. ........................... 10

        A. Title IX permits separate living facilities for the different sexes based upon the physical differences between the sexes. ........................... 10

        B. The Equal Protection Clause permits the provision of separate male and female restrooms on the basis of sex. ........................... 15

        C. The *Whitaker* decision should be revisited. ............................... 18

            1. *Whitaker* failed to consider unique aspects of Title IX, and relied on "guidance" from the Supreme Court that the higher court has since declined to apply itself. ................... 19

            2. The few other circuits to address these issues have not reached consensus in this new area of the law. ................... 23

        D. The School District's position complies with Title IX and the Equal Protection Clause. ........................... 27

    II. The Remaining Injunctive Factors Demonstrate that No Preliminary Injunction Should Have Been Entered. ........................... 29

        A. Balance of Harms // Irreparable Harm ........................... 29

        B. Adequate Remedy at Law ........................... 32

C.  Public Policy ................................................................................................ 32

CONCLUSION ........................................................................................................ 34

CERTIFICATE OF COMPLIANCE ...................................................................... 35

CERTIFICATE OF SERVICE ................................................................................ 36

SHORT APPENDIX ............................................................................................... 37

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Adams v. Sch. Bd. of St. Johns Cnty.*,
3 F.4th 1299 (11th Cir. 2021), *vacated and en banc rehearing granted*,
9 F.4th 1369 (Aug. 23, 2021). ........................................................... 16, 17, 26

*Bostock v. Clayton Cnty., Ga.*,
140 S. Ct. 1731 (2020) ............................................................. *passim*

*Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*,
134 F.3d 821 (7th Cir. 1998) ........................................................... 32

*Brandt v. Bd. of Educ. of City of Chicago*,
480 F.3d 460, 467 (7th Cir. 2007) ............................................ 27, 29, 33

*Brannum v. Overton Cnty. Sch. Bd.*,
516 F.3d 489 (6th Cir. 2008) ........................................................... 16

*Cannon v. Univ. of Chicago*,
441 U.S. 677 (1979).................................................................... 10

*Chaney v. Plainfield Healthcare Ctr.*,
612 F.3d 908 (7th Cir. 2010) ........................................................... 20

*Cohen v. Brown Univ.*,
101 F.3d 155 (1st Cir. 1996)........................................................... 10

*Courthouse News Serv. v. Brown*,
908 F.3d 1063 (7th Cir. 2018) ....................................................... 9, 29

*Dodds v. U.S. States Dep't of Educ.*,
845 F.3d 217 (6th Cir. 2016) ........................................................... 24

*Doe 2 v. Shanahan*,
917 F.3d 694 (D.C. Cir. 2019)......................................................... 15

*Doe by Doe v. B.P.S. Guard Servs., Inc.*,
945 F.2d 1422 (8th Cir. 1991) ......................................................... 14

*Doe v. Boyertown Area Sch. Dist.*,
897 F.3d 518 (3d Cir. 2018)........................................................ 23, 33

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975)..................................................................... 28

*Etsitty v. Utah Transit Auth.*,
  502 F.3d 1215 (10th Cir. 2007) ..................................................... 20, 27

*Faulkner v. Jones*,
  10 F.3d 226 (4th Cir. 1993) ................................................................ 16

*Forts v. Ward*,
  621 F.2d 1210 (2d Cir. 1980) ............................................................. 17

*G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*,
  822 F.3d 709 (4th Cir. 2016), *vacated*, 137 S. Ct. 1239 (2017) ............... 16

*Goins v. W. Grp.*,
  635 N.W.2d 717 (Minn. 2001) ............................................................ 20

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586, 634 (4th Cir. 2020), *as amended* (Aug. 28, 2020),
  *cert. denied*, 141 S. Ct. 2878 (2021) ...................................... 13, 25, 33

*Hernandez v. Hillsides, Inc.*,
  211 P.3d 1063 (2009) ................................................................. 13, 14

*Ill. Republican Party v. Pritzker*,
  973 F.3d 760 (7th Cir. 2020) ............................................................. 18

*J.A. v. Fort Wayne Comm'y Schs.*,
  No. 1:12-CV-155 JVB, 2013 WL 4479229 (N.D. Ind. Aug. 20, 2013) ..................... 17

*J.D.B. v. North Carolina*,
  564 U.S. 261 (2011) ........................................................................... 17

*Kelley v. Bd. of Trustees*,
  35 F.3d 265 (7th Cir. 1994) ............................................................... 22

*Liberti v. Walt Disney World Co.*,
  912 F. Supp. 1494 (M.D. Fla.1995) ...................................................... 14

*Loving v. United States*,
  517 U.S. 748 (1996) ............................................................................. 33

*Martin v. Int'l Olympic Comm.*,
  740 F.2d 670n.4 (9th Cir. 1984) ........................................................ 18

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ............................................................. 20

*N. Haven Bd. of Ed. v. Bell*,
    456 U.S. 512 (1982) ........................................................... 10

*Neal v. Bd. of Trustees of Cal. State Univs.*,
    198 F.3d 763 (9th Cir. 1999) .............................................. 10

*Nordlinger v. Hahn*,
    505 U.S. 1 (1992) ............................................................... 15

*Parents for Privacy v. Barr*,
    949 F.3d 1210 (9th Cir. 2020) ................................. 11, 23, 24

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989) ................................................ 19, 20, 22

*Rodriguez v. United States*,
    480 U.S. 522 (1987) ........................................................... 33

*SAS Inst. Inc. v. Iancu*,
    138 S. Ct. 1348 (2018) ...................................................... 33

*Strickler v. Waters*,
    989 F.2d 1375 (4th Cir. 1993) ............................................ 17

*Tagami v. City of Chicago*,
    875 F.3d 375 (7th Cir. 2017) .............................................. 15

*Texas v. United States*,
    201 F. Supp. 3d 810 (N.D. Tex. 2016), *order clarified*,
    No. 7:16-CV-00054-O, 2016 WL 7852331 (N.D. Tex. Oct. 18, 2016) ...................... 12

*Trujillo v. City of Ontario*,
    428 F. Supp. 2d 1094 (C.D. Cal. 2006) ............................... 13

*United States v. Baxter Healthcare Corp.*,
    901 F.2d 1401 (7th Cir. 1990) .............................................. 9

*United States v. Hill*,
    48 F.3d 228 (7th Cir. 1995) ................................................ 19

*United States v. Nagel*,
    559 F.3d 756 (7th Cir. 2009) .............................................. 15

*United States v. Virginia*,
    518 U.S. 515 (1996) ............................................... 12, 15, 18

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
  858 F.3d 1034 (7th Cir. 2017) ............................................................ *passim*

*York v. Story*,
  324 F.2d 450 (9th Cir. 1963) ............................................................ 16

*Young v. Superior Ct.*,
  57 Cal. App. 3d 883 (Cal. Ct. App. 1976) ........................................ 12

## Constitutional Provisions / Statutes

U.S. Const. amend XIV, § 1 ............................................................ *passim*

10 U.S.C. § 7419 ............................................................................ 18

20 U.S.C. § 1681 ........................................................................ 1, 11

20 U.S.C. § 1686 ...................................................................... *passim*

28 U.S.C. § 1292 .............................................................................. 1

28 U.S.C. § 1331 .............................................................................. 1

42 U.S.C. § 1983 .............................................................................. 1

42 U.S.C. § 2000e-2 ("Title VII") .................................................. *passim*

## Regulations / Rules

34 C.F.R. § 106.32 .......................................................................... 21

34 C.F.R. § 106.33 ...................................................................... *passim*

34 C.F.R. § 106.34 .................................................................. 12, 21, 24

34 C.F.R. § 106.37 .................................................................... 20, 21

34 C.F.R. § 106.41 .......................................................................... 21

Fed. R. Civ. P. 65 ............................................................................ 1

## Other Authorities

118 Cong. Rec. 5,807 (1972) ....................................................... 11

Black's Law Dictionary ............................................................... 20

Seventh Circuit Civil Pattern Jury Instructions, No. 7.26 ....................................... 32

## JURISDICTIONAL STATEMENT

The District Court's jurisdiction in this action is based on the existence of a federal question under 28 U.S.C. § 1331 for claims arising under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, and Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681.

The order sought to be reviewed was entered on April 29, 2022. (A1-16[1] (Dkt. 50).) In that order, the District Court granted the Plaintiff's motion for a preliminary injunction. (Dkt. 50.) On May 19, 2022, the District Court subsequently entered a separate preliminary injunction order in compliance with Fed. R. Civ. P. 65(d)(1)(C). (A16 (Dkt. 65).)

The appellate jurisdiction of this Court is conferred under 28 U.S.C. § 1292(a)(1). The School District's brief is due on June 13, 2022.

## STATEMENT OF THE ISSUE

Whether Title IX of the Education Amendments Act of 1972 and the Equal Protection Clause to the United States Constitution mandate that a school provide access to the middle school boys' restrooms to a seventh grade student whose sex and physical anatomy are female and whose request for a male gender marker was denied by a state court but who is diagnosed with gender dysphoria.

---

[1] "A" refers to the short appendix included with this brief.

## STATEMENT OF THE CASE

### I.  Factual Background

The John R. Wooden Middle School (the "middle school") is a part of the Metropolitan School District of Martinsville (the "School District"). The middle school includes seventh and eighth graders, and has 676 students in attendance. (Dkt. 29-4 at 8 ((30)(b)(6) Deposition of Fred Kutruff ("Kutruff Dep.") at 8:11-19.) The middle school restrooms are separated by sex[2] (Dkt. 29-4 at 48 (Kutruff Dep. at 48:1-4), and there is a unisex restroom in the health office (*id.* at 49 (Kutruff Dep. at 49:13-25.) The health office restroom is available for use by all students, with permission from the school nurse. (*Id.* at 50 (Kutruff Dep. at 50:17-23.)

The School District addresses a student's request seeking to use the restroom that is different than that student's biological sex on a case-by-case basis, taking into account such considerations as (1) the number of years the student has been in transition, (2) whether the student has changed his or her outward appearance, (3) whether the student has been diagnosed with gender dysphoria, (4) whether the student is receiving hormones, (5) whether the student has received surgery, and (6) whether the student has legally requested and secured a name and gender marker change. (Dkt. 29-4 at 15-16, 19, 23-24 (Kutruff Dep. at 15:22-16:14, 19:6-14, 23:16-24:9.) At the middle school level, the School District's decision to consider these items is based on the age and maturity of the student population and an effort to

---

[2] "Sex" is different than "gender," as a person's sex is identified "with their genitals that are typically described at birth" while a person's gender has to do with their experience relative to their sex. (Dkt. 34-3 at 2 ("Fortenberry Dep.") at 8:21-10:16.)

protect the safety and privacy of students. (Dkt. 29-4 at 24 (Kutruff Dep. at 24:2-7.) Consistent with this approach, the School District has students within its system who have been allowed to use a bathroom consistent with their stated gender identity that differs from their sex. (Dkt. 29-4 at 23 (Kutruff Dep. at 23:6-15.)

A.C. is thirteen years old and was a seventh grade student during the 2021-2022 school year. (Dkt. 34-1 at 2 (Deposition of M.C. ("M.C. Dep.") at 6:11-12; Dkt. 34-2 at 2 (Deposition of A.C. ("A.C. Dep.") at 13:17-20).) A.C.'s sex is female, and A.C.'s physical anatomy is that of a female. (Dkt. 34-1 at 5, 10 (M.C. Dep. at 20:4-5, 40:1-3.)

During the fifth and sixth grade, A.C. attended Bell Intermediate School in the School District. (Dkt. 34-1 at 5-6 (M.C. Dep. at 21:23-22:3.) A.C. did not request to use the boys' restrooms at the intermediate school. (Dkt. 34-1 at 6 (M.C. Dep. at 23:23-24:17); Dkt. 34-2 at 2 (A.C. Dep. at 12:19-13:1.) Instead, A.C. requested, and was allowed to use, the health clinic restroom. (Dkt. 34-1 at 6 (M.C. Dep. at 25:1-7); Dkt. 34-2 at 2 (A.C. Dep. at 12:22-13:1.)

In August 2021, A.C. began seventh grade at the middle school, and began using the single person restroom in the health clinic. (Dkt. 34-1 at 7 (M.C. Dep. at 26:14-27:3.) In September or October 2021, A.C.'s stepfather called the middle school inquiring about restroom access for transgender students. (Dkt. 29-4 at 38-39 (Kutruff Dep. at 38:19-39:7.) In response, the middle school principal relayed that students who identified as transgender were allowed to use the nurse's office. (*Id.*)

3

In October 2021 and December 2021, A.C. was seen by a nurse practitioner at the Riley Gender Health Clinic. (Dkt. 34-1 at 3, 9 (M.C. Dep. at 11:22-12:10, 36:18-37:7.) At the initial visit, the nurse practitioner diagnosed A.C. with gender dysphoria, which is considered a mental and physical disorder. (Dkt. 34-1 at 10 (M.C. Dep. at 38:16-20); Dkt. 29-2, ¶ 14; Dkt. 34-3 at 3-4 (Deposition of Dr. J. Dennis Fortenberry ("Fortenberry Dep.") at 15:15-16:2).) This diagnosis and related medical records were not provided to the school until after the initiation of this action and during the discovery phase of the case. (Dkt. 34-1 at 10 (M.C. Dep. at 39:2-5); Dkt. 29-4 at 10, 40 (Kutruff Dep. at 10:6-13, 40:8-11.) Such information is something the School District takes into account in determining access to the boys' restrooms. (Dkt. 29-4 at 40 (Kutruff Dep. at 40:8-15.)

A.C. has gone to Riley twice to receive injections of Depo-Provera to stop periods. (Dkt. 34-1 at 9-10 (M.C. Dep. at 36:18-37:7, 37:24-38:2.) Although A.C. has expressed an interest in receiving hormones (testosterone), no hormones have yet been prescribed. (Dkt. 34-1 at 10-11 (M.C. Dep. at 40:14-42:8.)

After the initial visit at Riley in October 2021, A.C. and A.C.'s mother, M.C., connected with GenderNexus, an advocacy organization in Indianapolis. (Dkt. 34-1 at 11 (M.C. Dep. 42:17-43:2.) On November 3, 2021, A.C., M.C., and a GenderNexus employee participated in a Zoom call with middle school personnel and requested that the school allow A.C. to use the boys' restroom. (Dkt. 34-1 at 7, 11 (M.C. Dep. at 26:24-28:4, 43:15-45:19.) M.C. and A.C. were advised that A.C. could continue to use the health clinic restroom and that A.C. would be allocated more time to go back

and forth from that restroom without being considered late for class. (Dkt. 29-4 at 61 (Kutruff Dep. at 61:6-25.) Following the call, M.C. gave A.C. her permission to use the boys' restroom. (Dkt. 34-1 at 12 (M.C. Dep. at 48:24-49:11); Dkt. 34-2 at 7 (A.C. Dep. at 34:3-15.)

In mid-November 2021, the middle school principal received an email from a teacher who had been using a urinal in the boys' restroom and had seen A.C. in the restroom. (Dkt. 29-4 at 64 (Kutruff Dep. at 64:2-14.) On November 22, 2021, the school social worker called A.C. to the office and instructed A.C. not to use the boys' restroom and expressed concern for A.C.'s safety against bullying. (Dkt. 29-4 at 65-66 (Kutruff Dep. at 65:22-66:10); Dkt. 34-2 at 8 (A.C. Dep. at 36:19-37:12.)

Shortly after the Thanksgiving holiday, A.C. met with the middle school principal, who reiterated that A.C. was expected to use the health clinic restroom or the girls' restroom. (Dkt. 29-4 at 67 (Kutruff Dep. at 67:11-16.) A.C. complied with that request. (Dkt. 34-1 at 13 (M.C. Dep. at 53:18-22.) A.C. has not used the girls' restroom, and sometimes avoids using the health restroom. (Dkt. 34-2 at 9 (A.C. Dep. at 41:3-16); Dkt. 29-3, ¶ 22.)

A.C. has been marked tardy for being late to class but has never received discipline for it. (Dkt. 34-1 at 7 (M.C. Dep. at 28:5-7); Dkt. 29-3, ¶ 21.) With the exception of one or two occasions, teachers have granted A.C.'s requests to use the restroom during class. (Dkt. 34-2 at 3 (A.C. Dep. at 17:9-18:11.)

A.C. filed an action in Indiana state court requesting a legal change of A.C.'s name and gender marker to male. (Dkt. 29-2, ¶ 15.) The School District would

consider such a gender marker change in relation to A.C.'s request to access the boys' restrooms. (Dkt. 29-4 at 30 (Kutruff Dep. at 30:5-10).) A.C.'s request for a legal name change was granted on March 23, 2022. (Dkt. 38-3.) However, A.C.'s request for a gender marker change was denied by the state court, who entered findings of fact and conclusions of law, and determined that such a change was not supported by the evidence and would not be in A.C.'s best interests. (Dkt. 43-1.)

## II.    Procedural Background

On December 3, 2021, A.C. filed a complaint and request for preliminary injunction in the District Court, seeking access to the middle school's boys' restrooms.[3] (Dkt. 1, 9.) On January 25, 2022, the School District filed its answer. (Dkt. 28.) The parties exchanged briefing on the preliminary injunction request, (Dkt. 30, 35, 39), and presented oral argument on April 8, 2022. (Dkt. 40.)

On April 11, 2022, A.C. provided notice to the trial court that A.C.'s request for a gender marker change had been denied by the state trial court. (Dkt. 41.) On April 12, 2022, the School District provided a sealed copy of the state trial court's order and requested that the District Court take judicial notice of that order and its collateral estoppel effects. (Dkt. 42.) The parties filed further briefing (Dkt. 45, 46.) The District Court ultimately granted the request to take judicial notice of the state court order, but denied that the order had any collateral estoppel effects. (Dkt. 47.)

---

[3] A.C. also initially requested an injunction mandating the use of male pronouns by school staff, but abandoned that request, as staff had already voluntarily complied with that request.

On April 27, 2022, the District Court entered an order granting A.C.'s request for a preliminary injunction and requiring the School District to "permit A.C. to use any boys' restroom within [the middle school]." (A15 (Dkt. 50 at 15).) In the Order, the District Court held that *Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017), controls and therefore A.C. is likely to succeed on the merits of the Title IX and Equal Protection Clause claims against the School District. (A10-12.) The District Court found that the remaining preliminary injunction factors also weighed in favor of A.C. (A13-15.) On May 19, 2022, the District Court subsequently entered a separate preliminary injunction order in compliance with Fed. R. Civ. P. 65(d)(1)(C). (A16 (Dkt. 65).)

On May 3, 2022, the School District filed an expedited motion to stay enforcement of the preliminary injunction pending appeal, (Dkt. 53), which was denied by the District Court on May 16, 2022. (Dkt. 61.)

## SUMMARY OF THE ARGUMENT

The School District has complied with Title IX and the Equal Protection Clause in relation to its middle school restrooms. Title IX expressly allows educational institutions to provide "separate living facilities for the different sexes." 20 U.S.C. § 1686 ("Section 1686"). Moreover, its regulations state that institutions "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. Consistent with these regulations, the School District has asked that A.C. continue to utilize the

restrooms consistent with A.C.'s biological sex or a unisex restroom in the health office until further steps are taken and additional information is gathered. In particular, A.C. filed a state court petition seeking to change A.C.'s legal name and gender marker, but A.C.'s request for a male gender marker was denied.

A.C.'s legal position rests almost entirely on *Whitaker*. But *Whitaker* applied a Title VII sex stereotyping discrimination theory in analyzing restroom access, omitting any mention of Section 1686 and failing to recognize fundamental differences between Title VII and Title IX. As an employment law, Title VII governs non-discrimination in the employment context and prohibits employment decisions (e.g. hiring, promotions, terminations) on the basis of sex. In contrast, Title IX recognizes the differences between the sexes and allows for schools to provide separate living facilities on that basis. Title IX's implementing regulations further allow for institutions to make a number of distinctions on the basis of sex. Therefore, while *Whitaker* sought to support its decision based upon guidance on Title VII from the Supreme Court, the higher court has since expressly declined to extend its Title VII jurisprudence to address "bathrooms, locker rooms, or anything else of the kind." *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1753 (2020). Notwithstanding those legal developments, *Whitaker* is otherwise distinguishable because it involved different facts, including the age of the plaintiff.

Ultimately, A.C. has not met the high preliminary injunction standard. Therefore, the School District respectfully requests that the preliminary injunction order be reversed.

## STANDARD OF REVIEW

"This Court gives substantial deference to a district court's decision to grant a preliminary injunction insofar as that decision involves the discretionary acts of weighing evidence or balancing equitable factors." *United States v. Baxter Healthcare Corp.*, 901 F.2d 1401, 14097 (7th Cir. 1990). However, "the more purely legal conclusions made by a district court in granting a preliminary injunction are subject to *de novo* review." *Id.*

## ARGUMENT

"To obtain a preliminary injunction, a plaintiff must first show that: (1) without such relief, it will suffer irreparable harm before final resolution of its claims; (2) traditional legal remedies would be inadequate; and (3) it has some likelihood of success on the merits." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). "If a plaintiff makes such a showing, the court next must weigh the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one." *Id.* "This assessment is made on a sliding scale: 'The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'" *Id.* (citation omitted). "Finally, the court must ask whether the preliminary injunction is in the public interest, which entails taking into account any effects on non-parties." *Id.* "Ultimately, the moving party bears the burden of showing that a preliminary injunction is warranted." *Id.*

Here, the issue at the crux of this appeal is whether Title IX and the Equal Protection Clause mandate access to the middle school boys' restrooms by A.C., a seventh grade student whose sex and physical anatomy are female. The School District begins by reviewing Title IX and the Equal Protection Clause, both of which allow institutions to provide separate restrooms on the basis of sex. Pursuant to that legal framework, the School District examines this Court's ruling in *Whitaker*, and requests that this Court reconsider the framework adopted there. The School District then addresses the remainder of the preliminary injunction factors, all of which fail to warrant the extraordinary relief of a preliminary injunction based upon the evidence presented below. Each point is addressed in turn.

I.    **A.C.'s Demand to Use the Boys' Restrooms is Not Supported by Title IX or the Equal Protection Clause.**

A.  **Title IX permits separate living facilities for the different sexes based upon the physical differences between the sexes.**

Fifty years ago, the provisions enacted as Title IX were introduced in the Senate by Senator Birch Bayh during debate on the Education Amendments of 1972. *See N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 524 (1982). "Title IX was Congress's response to significant concerns about discrimination against women in education." *Neal v. Bd. of Trustees of Cal. State Univs.*, 198 F.3d 763, 766 (9th Cir. 1999). "Title IX was passed with two objectives in mind: 'to avoid the use of federal resources to support discriminatory practices,' and 'to provide individual citizens effective protection against those practices.'" *Cohen v. Brown Univ.*, 101 F.3d 155, 165 (1st Cir. 1996) (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979)).

Title IX mandates that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Yet, "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." *Id.* § 1686. Thus, while Title IX prohibits exclusion from participation in educational programs or activities based upon sex, it expressly allows institutions to provide separate living facilities based upon sex. In expounding upon that framework, Title IX's regulations state that institutions "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. In other words, "Title IX authorizes sex-segregated facilities . . . ." *Parents for Privacy v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020). As Senator Bayh explained, this exemption was intended to "permit differential treatment by sex . . . in sports facilities or other instances where personal privacy must be preserved." 118 Cong. Rec. 5,807 (1972) (statement of Sen. Bayh). Importantly, permitting separate facilities was not permitted upon proof of a privacy violation but instead allowed school corporations to preserve these recognized differences and avoid privacy issues of all varieties faced when two sexes use common facilities.

Title IX's authorization for separate facilities is based upon the physical differences between the sexes. "Physical differences between men and women are

11

enduring." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (Ginsburg, J.) (cleaned up). When Title IX and its implementing regulations were enacted, privacy concerns were understandably recognized as elevated in those areas where clothes are removed and personal bodily functions are performed. *See Young v. Superior Ct.*, 57 Cal. App. 3d 883, 887 (Cal. Ct. App. 1976) ("An occupant of a closed bathroom, the same as an occupant of a closed bedroom, is entitled to an expectation of privacy far greater than those persons in the common areas of a house, such as the living room and kitchen.").

These physical differences are most likely to be exposed, to varying degrees, in areas reserved exclusively for performing bodily functions or other inherently personal acts. Title IX's allowance for different facilities "undoubtedly was permitted because the areas identified by the regulations are places where male and female students may have to expose their nude or partially nude body, genitalia, and other private parts, and separation from members of the opposite sex, those whose bodies possessed a different anatomical structure, was needed to ensure personal privacy." *Texas v. United States*, 201 F. Supp. 3d 810, 833 (N.D. Tex. 2016) (cleaned up), *order clarified*, No. 7:16-CV-00054-O, 2016 WL 7852331 (N.D. Tex. Oct. 18, 2016). Indeed, Title IX even extends this anatomical-centric permission to "separate educational sessions for boys and girls when dealing with instruction concerning human sexuality." *Id.* (citing 34 C.F.R. § 106.34). "[T]hese privacy interests are broader than *the risks of actual* bodily exposure," and "*include the intrusion created by mere presence.*" *Grimm v. Gloucester Cnty. Sch. Bd.*, 972

F.3d 586, 634 (4th Cir. 2020) (Niemeyer, J., dissenting), *as amended* (Aug. 28, 2020), *cert. denied*, 141 S. Ct. 2878 (2021).

That recognition has not changed. Instead, those same privacy distinctions remain true today. In *Hernandez v. Hillsides, Inc.*, 211 P.3d 1063 (2009), the California Supreme Court reviewed an appeal of a tort claim alleging invasion of privacy at a place of employment where video surveillance was used. *Id.* at 1066. Addressing a central issue in the case—expectation of privacy, the court surveyed rulings from state and federal courts. *Id.* at 1075. "At one end of the spectrum are settings in which work or business is conducted in an open and accessible space, within the sight and hearing not only of coworkers and supervisors, but also of customers, visitors, and the general public." *Id.* (collecting cases involving an outdoor patio of public restaurant; common, open, and exposed area of a workplace; and monitoring of customers as they shop in stores). In those public settings, privacy interests are diminished. *See id.* at 1075.

"At the other end of the spectrum are areas in the workplace subject to restricted access and limited view, and reserved exclusively for performing bodily functions or other inherently personal acts." *Id.* Analyzing this end of the privacy spectrum with more heightened interests, the court cited *Trujillo v. City of Ontario*, 428 F. Supp. 2d 1094, 1099–1100, 1103, 1119–1122 (C.D. Cal. 2006), as "recognizing that employees have common law and constitutional privacy interests while using locker room in basement of police station, and can reasonably expect that employer will not intrude by secretly videotaping them as they undress"; *Doe by Doe v. B.P.S.*

*Guard Services, Inc.*, 945 F.2d 1422, 1424, 1427 (8th Cir. 1991), for the "similar conclusion as to models who were secretly viewed and videotaped while changing clothes behind curtained area at fashion show"; and *Liberti v. Walt Disney World Co.*, 912 F. Supp. 1494, 1499, 1506 (M.D. Fla.1995), for a "similar conclusion as to dancers who were secretly viewed and videotaped while changing clothes and using restroom in dressing room at work." *Hernandez*, 211 P.3d at 1075.

While these different spaces are treated differently due to privacy protections, Title IX's statutory permission to maintain different facilities does not rest upon a school corporation demonstrating a privacy violation has occurred or may occur. Rather, Title IX expressly incorporates the longstanding reasons for the adoption of different spaces for the sexes when changing or performing bodily functions, however slight or nonexistent a privacy violation might be.

Instead of addressing the Title IX statutory and regulatory language approving different facilities for different sexes, the District Court avoided the language altogether. The District Court noted that A.C. was not complaining of inappropriate facilities for the different sexes "or the current ones be redesignated in any way." (Dkt. 50 at 11.) But in doing so, the District Court conflated the anti-discrimination provisions under Title IX with the provisions that permit different but equitable facilities. In other words, the Title IX provisions regarding facilities not only allow claims for facilities that discriminate on the basis of sex but also permit schools to maintain different facilities based on sex. The District Court erred in assuming that the former, and not the latter, exists under Title IX's rubric.

## B. The Equal Protection Clause permits the provision of separate male and female restrooms on the basis of sex.

The Equal Protection Clause of the Fourteenth Amendment, § 1, commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." "Of course, most laws differentiate in some fashion between classes of persons. The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). "Equal protection of the laws means that all persons similarly situated should be treated alike." *United States v. Nagel*, 559 F.3d 756, 760 (7th Cir. 2009). However, "[t]here is no constitutional right for . . . biological males who identify as female to live, sleep, shower, and train with biological females." *Doe 2 v. Shanahan*, 917 F.3d 694, 707–08 (D.C. Cir. 2019) (Williams, J., concurring).

The Equal Protection Clause "does not make sex a proscribed classification," and therefore a policy that classifies on the basis of sex is constitutional if it survives the two requirements of intermediate scrutiny. *United States v. Virginia*, 518 U.S. at 533. First, the government must prove that the "classification serves important governmental objectives." *Id.* (internal quotation marks omitted). Second, the government must prove that "the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* (internal quotation marks omitted). "This intermediate level of judicial scrutiny recognizes that sex 'has never been rejected as an impermissible classification in all instances.'" *Tagami v. City of Chicago*, 875 F.3d 375, 380 (7th Cir. 2017) (citation omitted).

A school district's decision to separate bathrooms by sex, consistent with Title IX, satisfies both prongs. First, such a policy or practice serves important objectives of protecting the interests of students in using the restroom away from the opposite sex and in shielding their bodies from exposure to the opposite sex. This need for privacy justifies "separate public rest rooms for men and women based on privacy concerns." *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993). *See Adams v. Sch. Bd. of St. Johns Cnty.*, 3 F.4th 1299, 1308 (11th Cir. 2021) ("[T]he government may promote its interest in protecting privacy by maintaining separate bathrooms for boys and girls, men and women."), *vacated and en banc rehearing granted*, 9 F.4th 1369 (Aug. 23, 2021).

Indeed, "[a]cross societies and throughout history, it has been commonplace and universally accepted to separate public restrooms, locker rooms, and shower facilities on the basis of biological sex in order to address privacy and safety concerns arising from the biological differences between males and females." *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 734 (4th Cir. 2016) (Niemeyer, J., concurring in part and dissenting in part), *vacated*, 137 S. Ct. 1239, 197 L.Ed.2d 460 (2017). "The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963). *See also Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008) (recognizing constitutional right to privacy, which includes "the right to shield one's body from exposure to viewing by the opposite sex" in context of video surveillance

in school locker rooms); *Forts v. Ward*, 621 F.2d 1210, 1217 (2d Cir. 1980) (noting privacy interest "entitled to protection concerns the involuntary viewing of private parts of the body by members of the opposite sex"); *Strickler v. Waters*, 989 F.2d 1375, 1387 (4th Cir. 1993) ("[W]hen not reasonably necessary, exposure of a prisoner's genitals to members of the opposite sex violates his constitutional rights.").

The importance of assuring privacy is only heightened for students in the middle school setting. Indeed, middle school students are less mature and only "on the threshold of awareness of human sexuality." *J.A. v. Fort Wayne Comm'y Schs.*, No. 1:12-CV-155 JVB, 2013 WL 4479229, at *6 (N.D. Ind. Aug. 20, 2013). Such children "characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them." *J.D.B. v. North Carolina*, 564 U.S. 261, 272–73 (2011) (Sotomayor, J.).

Furthermore, separating middle school restrooms by sex is substantially related to the achievement of the objectives of maintaining privacy, as students use the bathroom in a separate space from the opposite sex and are protected against exposure of their bodies to the opposite sex. "[T]he Supreme Court has long required that courts defer to the judgment of public-school officials in this context." *Adams*, 3 F.4th at 1328 (Pryor, J., dissenting). Indeed, "[c]ourts have long understood that the 'special sense of privacy' that individuals hold in avoiding bodily exposure is heightened 'in the presence of people of the other sex.'" *Id.* at 1331 (collecting authority).

Thus, the provision of separate restrooms on the basis of sex does not violate the Equal Protection Clause. If this approach does not satisfy constitutional scrutiny, then Title IX's facilities provisions are unconstitutional, as are other similar provisions in federal law and even past Supreme Court precedent. *See, e.g.*, 10 U.S.C. § 7419 (requiring Secretary of Army to "provide for housing male recruits and female recruits separately and securely from each other during basic training," including physically separated sleeping areas and latrine areas); *United States v. Virginia*, 518 U.S. at 550 n.19 ("Admitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements . . . ."); *see also Martin v. Int'l Olympic Committee*, 740 F.2d 670, 683 n.4 (9th Cir. 1984) (Pregerson, J., dissenting) ("If the concurrence's reasoning were carried to its logical conclusion, all Olympic events in which men and women participate separately would be banned as apartheid.").

## C. The *Whitaker* decision should be revisited.

In concluding that A.C. was likely to succeed on the merits, the District Court found itself bound by *Whitaker*. Notably, since its publication, this Court has criticized *Whitaker* for using the wrong standard of review in its likelihood of success portion of its analysis, as its merits analysis was premised on the "low threshold" of the "better than negligible" standard. *See Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762-63 (7th Cir. 2020). In this appeal, the School District respectfully requests that this Court revisit the underlying holding in *Whitaker*. While, "[p]recedents do not cease to be authoritative merely because counsel in a later case advance a new argument[,] . . . as a practical matter an opinion that

contains no discussion of a powerful ground later advanced against it is more vulnerable to being overruled than an opinion which demonstrates that the court considered the ground now urged as a basis for overruling." *United States v. Hill*, 48 F.3d 228, 232 (7th Cir. 1995). Such is the case here.

> ### 1. *Whitaker* failed to consider unique aspects of Title IX, and relied on "guidance" from the Supreme Court that the higher court has since declined to apply itself.

In *Whitaker*, the panel looked to Title VII when construing Title IX, and found that a student who identified as a transgender male could bring a sex discrimination claim based on a sex-stereotyping theory under *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). The Court opined: "A policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX." *Whitaker*, 858 F.3d at 1049. Likewise, in addressing the plaintiff's Equal Protection claim, *Whitaker* found that the plaintiff was likely to succeed on the same sex-stereotyping theory because the defendant school district "treat[ed] transgender students . . . who fail to conform to the sex-based stereotypes associated with their assigned sex at birth, differently." *Id.* at 1051.

However, *Whitaker* overlooked that "Title VII . . . is a vastly different statute from Title IX[.]" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). On one hand, "Title VII's message is 'simple but momentous': An individual employee's sex is 'not relevant to the selection, evaluation, or compensation of employees.'" *Bostock*, 140 S. Ct. at 1741 (quoting *Price Waterhouse*, 490 U.S. at 239). On the

19

other hand, "Title VII differs from Title IX in important respects: For example, under Title IX, universities must consider sex in allocating athletic scholarships, 34 C.F.R. § 106.37(c), and may take it into account in 'maintaining separate living facilities for the different sexes. 20 U.S.C. § 1686." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). "Thus, it does not follow that principles announced in the Title VII context automatically apply in the Title IX context." *Id.*

Indeed, Title IX's allowance for separate living facilities based upon sex necessarily requires distinctions: biological females use the girls' restrooms; and biological males use the boys' restrooms. These distinctions are "on the basis of sex," and are, by definition, "discrimination." *See* Black's Law Dictionary (defining "discrimination" as "[t]he intellectual faculty of noting differences and similarities"). But such distinctions are not unlawful—Title XI expressly allows for them with regard to living facilities. Otherwise, the permission in Section 1686 to have separate living facilities for the different sexes is a nullity. *See Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224-25 (10th Cir. 2007) (*Price Waterhouse* does not require "employers to allow biological males to use women's restrooms. Use of a restroom designated for the opposite sex does not constitute a mere failure to conform to sex stereotypes."), *overruled on other grounds by Bostock*, 140 S. Ct. 1731; *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 913 (7th Cir. 2010) ("[T]he law tolerates same-sex restrooms or same-sex dressing rooms . . . to accommodate privacy needs"); *see also Goins v. W. Grp.*, 635 N.W.2d 717, 720 (Minn. 2001) ("an

employer's designation of employee restroom use based on biological gender is not sexual orientation discrimination").

*Whitaker* did not address this aspect of Title IX. Any mention of Section 1686 and its express permission to provide separate living facilities is missing.[4] And, while *Whitaker* mentioned 34 C.F.R. § 106.33, it omitted the five key words ("on the basis of sex") from its summary of that regulation. *See* 858 F.3d at 1047.

Indeed, *Whitaker* failed to consider the logical impact of its decision on Title IX as it relates to other private living spaces and as it relates to other permitted distinctions allowed by Title IX and its implementing regulations. Logically, if "[a] policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance" in violation of Title IX, *see* 858 F.3d at 1049, then so do rules that allow institutions to "provide separate housing on the basis of sex," 34 C.F.R. § 106.32, provide separate locker rooms and shower facilities "on the basis of sex," 34 C.F.R. § 106.33, provide "separation of students by sex" within physical education classes during contact sports, 34 C.F.R. § 106.34, provide separate classes relating to human sexuality "in separate sessions for boys and girls," *id.*, provide opportunities for athletic scholarships based upon sex, 34 C.F.R. § 106.37(c), and allow for separate teams for members of each sex where selection is based upon competitive skill or involve contact sports. 34 C.F.R. § 106.41(b). This Court has previously held that the provision of separate sports teams on the basis of sex is

---

[4] The District Court similarly failed to mention or discuss Section 1686.

"not at odds with the purpose of Title IX." *Kelley v. Bd. of Trustees*, 35 F.3d 265, 270 (7th Cir. 1994). Yet *Whitaker* offers no help in understanding how these "on the basis of sex" distinctions would not amount to unlawful discrimination under the sex stereotyping framework borrowed from Title VII, nor does it consider the impact that its ruling may have on other aspects of Title IX, including athletics and privacy concerns in other living spaces (like locker rooms and showers).

*Whitaker*'s rush to weld a Title VII sex stereotyping framework onto a Title IX restroom access issue is contrasted by the Supreme Court's subsequent declination to do so in *Bostock v. Clayton County*, 140 S. Ct. 1731. In *Bostock*, the Supreme Court expressly declined to extend its ruling as it pertained to sex discrimination in the workplace (which is prohibited by Title VII) to issues pertaining to sex assigned restrooms and locker rooms (which are expressly permitted by Title IX). The Supreme Court noted that issues of "sex-segregated bathrooms, locker rooms, and dress codes" were not before the Court, as it had "not had the benefit of adversarial testing about the meaning" of "other federal or state laws that prohibit sex discrimination." 140 S. Ct. at 1753. Moreover, the Court declined to even address the impact of its own holding in the employment context as it related to bathrooms and locker rooms. *See id.* ("Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind."). Thus, the Supreme Court specifically reserved this very issue for another day, implicitly rejecting any suggestion that *Price Waterhouse* or its Title VII jurisprudence

addressed these separate issues or should be relied upon in an apples-to-apples fashion as was done in *Whitaker*.

### 2. The few other circuits to address these issues have not reached consensus in this new area of the law.

In addition to relying upon *Whitaker*, the District Court concluded that "the overwhelming majority of federal courts" have "concluded that preventing a transgender student from using a school restroom consistent with the student's gender identity violates Title IX." (A.15.) The District Court failed to provide any tally of an "overwhelming majority." In fact, a closer review reveals that the push to mandate restroom access based upon gender identity has yet to be addressed by the overwhelming majority of federal circuits and is far from settled.

The only two appellate cases other than *Whitaker* that the District Court cited relating to restroom access, *Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020) and *Doe v. Boyertown Area School District*, 897 F.3d 518 (3d Cir. 2018), did not hold that Title IX mandated restroom access based on gender identity. Instead, in *Boyertown*, the Third Circuit noted that, while "Title IX prohibits discrimination based on sex in all educational programs that receive funds from the federal government . . . . , **discrimination with regard to privacy facilities is exempt from that blanket prohibition**." 897 F.3d at 533 (citing 34 C.F.R. § 106.33) (emphasis supplied). The Third Circuit explained that "[t]his exception is permissive—Title IX does not require that an institution provide separate privacy facilities for the sexes." *Id.* Thus, allowing students to use bathrooms and locker rooms consistent with the students' gender identities as opposed to their sex did not

violate Title IX. *Id.* at 533-36. Although it noted *Whitaker*, the Third Circuit expressly declined to decide whether "barring transgender students from using privacy facilities that align with their gender identity would . . . constitute discrimination." 897 F.3d at 536.

Similarly, in *Parents for Privacy*, the Ninth Circuit concluded that a public school district "*may* allow transgender students to use school bathrooms, locker rooms, and showers that match their gender identity rather than their biological sex they were assigned at birth." 949 F.3d at 1217-18 (emphasis supplied). While deciding that sex-separated facilities are not required by Title IX, the Ninth Circuit recognized that Title IX allows for such separation. *See id.* at 1227.

Thus, aside from *Whitaker*, only three circuit courts have addressed affirmative demands for school restroom access based upon gender identity. The analysis in those decisions—all of which were decided 2-1 and one of which has since been vacated and is undergoing en banc review—is flawed.

First, in *Dodds v. United States Department of Education*, a 2-1 per curiam order, the Sixth Circuit affirmed the denial of stay of an injunction which ordered "the school district to treat an eleven-year old transgender girl as a female and permit her to use the girls' restroom." 845 F.3d 217, 220 (6th Cir. 2016). In questioning the school district's likelihood of success, however, the *Dodds* majority relied solely on a sex-stereotyping theory, failed to consider interests of privacy, and never mentioned Section 1686 or 34 C.F.R. § 106.33.

24

Second, in *Grimm v. Gloucester County School Board*, the Fourth Circuit found in a 2-1 decision that disallowing a student from using a restroom consistent with the student's gender identity violated Title IX and the Equal Protection Clause. *See* 972 F.3d 586, 615-17 (4th Cir. 2020), *rehearing en banc denied*, 976 F.3d 399 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021). The majority observed that the "act of creating sex-separated restrooms in and of itself [was] not discriminatory" or unconstitutional. *Id.* at 618 & n.17. Yet, borrowing from Title VII and its own interpretation of *Bostock*, the court concluded that mandating the use of separate facilities based upon biological sex was discriminatory because it "excluded Grimm from the boys restrooms 'on the basis of sex.'" *Id.* at 616-17.

As demonstrated by the *Grimm* dissent, this position "renders on a larger scale any separation on the basis of sex nonsensical," undercutting Title IX and its underlying policies. *Id.* at 628 (Niemeyer, J., dissenting). While the *Grimm* majority criticized the school board for "rely[ing] on its own discriminatory notions of what 'sex' means," *id.* at 618, this criticism "overlook[ed] the fact that Congress expressly provided *in the statute* that nothing in its prohibition against discrimination 'shall be construed to prohibit' schools 'from maintaining separate living facilities for the different sexes.'" *Id.* at 635 (Niemeyer, J., dissenting) (quoting Section 1686). Here, even A.C.'s purported expert acknowledges that sex is different than gender, and that a person's sex is identified "with their genitals that are typically described at birth." (Dkt. 34-3 at 2 (Fortenberry Dep. at 8:21-10:16).)

25

Third, the Eleventh Circuit also addressed this issue, although it framed the issue differently, and its decision was vacated and is currently under *en banc* review. *See Adams v. Sch. Bd. of St. Johns Cnty.*, 3 F.4th 1299 (11th Cir.), *vacated and rehearing en banc granted*, 9 F.4th 1369 (11th Cir. 2021). Notably, in *Adams*, the 2-1 panel decision declined to undertake any analysis of Title IX, vacating a prior opinion issued on August 7, 2020, and replacing it with a decision that reached only one ground under the Equal Protection Clause. 3 F.4th at 1303-04. In its analysis, the Eleventh Circuit found that "protecting the bodily privacy of young students is an important government interest" and recognized "that the government may promote its interest in protecting privacy by maintaining separate bathrooms for boys and girls, men and women." *Id.* at 1308. Yet, in framing the issue, the Eleventh Circuit panel concluded that the school district violated the Equal Protection Clause by assigning students to bathrooms based solely on the documents the district received at the time of enrollment. *Id.* at 1308-11. The dissent criticized the majority for recasting the issue before it, and concluded that the majority decision "would require all schoolchildren to use sex-neutral bathrooms and locker rooms." *Id.* at 1321 (Pryor, J., dissenting).

Consequently, while the District Court assumed there was an "overwhelming majority" of courts who have decided this issue, only three other circuits have addressed a student's demand to use a restroom different than his or her sex assigned at birth. Of those, the Sixth Circuit relied upon a sex stereotyping theory that ignored the unique aspects of Title IX; the Fourth Circuit rendered Section

26

1686 a nullity; and the Eleventh Circuit avoided the Title IX analysis altogether and sought to frame the issue differently (and ultimately was vacated for *en banc* review which is pending). This is far from a consensus.

### D. The School District's position complies with Title IX and the Equal Protection Clause.

"Public schools have an interest of constitutional dignity in being allowed to manage their affairs and shape their destiny free of minute supervision by federal judges and juries." *Brandt v. Bd. of Educ. of City of Chicago*, 480 F.3d 460, 467 (7th Cir. 2007). Consistent with the foregoing analysis, the recognized privacy interests in the restroom facilities, and the historical understanding of the physical differences between the sexes, the School District provides separate restroom facilities on the basis of sex. This position completely aligns with an appropriate understanding of Title IX and Equal Protection Clause.

The School Corporation's position cannot in any way be characterized as unlawful sex stereotyping. Instead, consistent with Title IX and its regulations, the School Corporation's position is based on the fact that Title IX allows separate toilet facilities on the basis of anatomical differences in those facility spaces where it matters—those areas where disrobing and performance of bodily functions increase the exposure of these anatomical differences. That decision is entirely lawful. *See Etsitty*, 502 F.3d at 1224-25.

Moreover, even if the analytical framework in *Whitaker* remains good law (and it should not), the School District's initial determination as to whether A.C. may be allowed access to the boys' restroom complies with that decision. In

*Whitaker*, the panel implicitly recognized that restroom access would not necessarily be required "where a student has merely announced that he is a different gender." 858 F.3d at 1050. Instead, access to the boys' restroom was found to be appropriate in that case because the plaintiff "ha[d] a medically diagnosed and documented condition," and "[s]ince his diagnosis, he has consistently lived in accordance with his gender identity." *Id.* The Court noted all the steps that Whitaker had taken to live as a boy student, including: (1) the number of years that Whitaker had been in transition, (2) Whitaker's alterations of outward appearance, (3) a gender dysphoria diagnosis, (4) receipt of hormones, and (5) a legal name change. Moreover, Whitaker was a high school senior, and the request for access to the boys' restroom was made in that context. *Cf. Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 n.11 (1975) ("In assessing whether a minor has the requisite capacity for individual choice the age of the minor is a significant factor.").

Here, the School District was not provided with this type of information prior to the filing of the lawsuit, and appropriately sought out more information. Unlike the senior high student in *Whitaker*, A.C. is in the seventh grade. A.C. has not received hormones and was denied a gender marker change by the state court after it undertook an individualized review of A.C.'s situation and determined that such a change would not be in A.C.'s best interests.

Given the lack of any guidance from the Supreme Court in *Bostock* as it pertains to issues relating to sex-separated restrooms (much less with regard to middle school restrooms), the distinguishing factors between this case and *Whitaker*

28

as it relates to the age of students involved and status of steps taken by the plaintiff in transition, the School District complied with the law in denying A.C. access to the boys' restrooms and in continuing to seek additional information that may alter that determination. As a result, A.C. failed to establish a likelihood of success on the merits of the Title IX claim, and the preliminary injunction should be vacated.

## II.    The Remaining Injunctive Factors Demonstrate that No Preliminary Injunction Should Have Been Entered.

As noted above, the analysis of the remaining preliminary injunction factors is determined upon a sliding scale: "'The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'" *Courthouse News Serv.*, 908 F.3d at 1068 (citation omitted). Based on the appropriate legal framework, A.C.'s claims are unlikely to succeed. This fundamentally alters the calculus as to the appropriateness of a preliminary injunction. Ultimately, the evidence presented by A.C. falls far short of the evidence presented in *Whitaker*.

### A.  Balance of Harms // Irreparable Harm

The balance of harms analysis weighs against A.C.'s request. The School District has made accommodations to allow A.C. more time to use the health clinic restroom. (Dkt. 29-4 at 61 (Kutruff Dep. at 61:6-25).) The fact that A.C. may be occasionally late to class is not evidence of irreparable harm. *See Brandt*, 480 F.3d at 465 ("[T]he damages sustained by an eighth grader as a consequence of missing phys ed and labs on nine days out of an entire school year are miniscule to the point of nonexistent[.]").

In the proceeding below, the District Court credited A.C.'s and M.C.'s accounts that A.C. felt stigmatized and isolated and that exclusion from the boys' restroom worsened A.C.'s feelings of anxiety and depression. (A.13.) Yet, this evidence falls short of showing irreparable harm. Unlike the plaintiff in *Whitaker*, there is no evidence that A.C. has restricted water intake, no evidence that A.C. has any medical condition that has put A.C. at risk of harm, and no evidence that A.C. has contemplated self-harm as a result of the restroom options offered. *Cf.* 858 F.3d at 1040-42. A.C. has continued to use the unisex health office restroom, as A.C. had been doing for the two years prior without incident. (Dkt. 34-2 at 2, 9 (A.C. Dep. at 12:22-13:1, 41:3-16); Dkt. 29-3, ¶ 22; Dkt. 34-1 at 6 (M.C. Dep. at 25:1-7).) There is also no evidence that A.C. has been ostracized by classmates for use of the health office restroom, which is available for use by all students, with permission from the school nurse. (Dkt. 29-4 at 50 (Kutruff Dep. at 50:17-23).)

Moreover, in the state court proceeding, the state court denied A.C.'s request to change A.C.'s gender marker from female to male. Notably, A.C. argued that it would be in the best interests of the child to allow for a gender marker change so that A.C. would have access to the boys' restroom. Based upon the evidence before it, however, the state court questioned whether A.C.'s best interests would be served by allowing A.C. to have access to the boys' restrooms and ultimately determined that granting a gender marker change would not be in A.C.'s best interests. (Dkt. 43-1.)

Furthermore, unlike the plaintiff in *Whitaker*, A.C. failed to provide the testimony of any medical professional as to any future harm that is likely to result to A.C. without injunctive relief. A.C.'s purported expert, Dr. Fortenberry, has not participated in the care of A.C., has not had any direct discussions with A.C. or M.C., has not performed an individualized assessment as to the severity of harm that A.C. will experience if not allowed to access the boys' restroom, and has not performed an individualized assessment of the reduction of harm if A.C. is allowed access to the boys' restroom. (Dkt. 34-3 at 9-10, 11-12 (Fortenberry Dep. at 63:16-64:20, 72:17-73:12).) The School District objected to Dr. Fortenberry's declaration as being based on inadmissible hearsay, lack of personal knowledge, and lack of foundation. (*See* Dkt. 35 at 22.) Indeed, Dr. Fortenberry testified that there should be an individualized assessment as to what facilities a patient would be most comfortable and safe in, but that he had not performed such an assessment for A.C. (Dkt. 34-3 at 11-12 (Fortenberry Dep. at 72:17-73:12).) As a result, the District Court omitted any mention of Dr. Fortenberry's conclusions in its analysis of harm.

The balance of harms analysis also favors maintaining the status quo. Granting A.C. unrestricted access to the boys' restrooms violates the privacy interests of other middle school students as discussed above. A primary objective in this case should be to protect the privacy interests of all students. And if school districts are unable to rely upon Title IX's regulations, which expressly allow for separate facilities by sex, administrators and faculty will be forced to navigate this new frontier without the benefit of established rules.

31

### B. Adequate Remedy at Law

"An injunction is an equitable remedy warranted only when the plaintiff has no adequate remedy at law, such as monetary damages." *Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 823 (7th Cir. 1998). In *Whitaker*, the Court found the plaintiff satisfied this element by asserting that the bathroom policy at issue caused him to contemplate suicide, a claim credited by an expert who had met with the plaintiff and performed an individualized review. 858 F.3d at 1046. This potential harm could not be compensated by monetary damages, establishing that there was no adequate remedy of law available. *Id.*

Here, no such evidence was presented. As set forth above, there is no evidence or expert testimony that A.C. has contemplated irreversible self-harm. *Cf.* 858 F.3d at 1040-42. Instead, the District Court found this factor was met solely based upon A.C.'s account of emotional harm. (A.14 (citation omitted).) But emotional harm is not without an adequate remedy at law under the Equal Protection Clause, as such alleged emotional distress is commonly compensated by monetary awards. *See* Seventh Circuit Civil Pattern Jury Instructions, No. 7.26. Accordingly, this preliminary injunction factor also was not met, at least as it relates to the Equal Protection claim.

### C. Public Policy

Finally, public policy weighs against the injunction in this case, as demonstrated by the plain language of Title IX and its regulations. By enacting Section 1686, Congress intentionally exempted privacy facilities from Title IX's

prohibition against discrimination based on sex. *See Boyertown*, 897 F.3d at 533. Thus, Title IX expressly permits the separation of facilities on the basis of enduring biological differences where privacy interests are heightened. *See* 34 C.F.R. § 106.33. Public policy weighs in favor of allowing local school districts to determine how to maintain these privacy interests, as the School District has done here. *See Brandt*, 480 F.3d at 467 ("Public schools have an interest of constitutional dignity in being allowed to manage their affairs and shape their destiny free of minute supervision by federal judges and juries.").

To the extent that Title IX should not allow the separation of such facilities or is based on a "discriminatory" notion of the differences between the sexes or the need for privacy, *see Grimm*, 972 F.3d at 618, that decision should be made through elected representatives in Congress, using clearly understood text. Congress is the branch "most capable of responsive and deliberate lawmaking." *Loving v. United States*, 517 U.S. 748, 757-58 (1996). Congress is in the best position to decide "what competing values will or will not be sacrificed to the achievement of a particular objective." *Rodriguez v. United States*, 480 U.S. 522, 526 (1987). As a result, this Court should defer to the statutory text, and leave these policy decisions to Congress and state legislatures. *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018) ("It is Congress's job to enact policy and it is this Court's job to follow the policy Congress has prescribed.").

Indeed, this consideration once again highlights the need to revisit this Court's decision in *Whitaker*. While Congress expressly permitted educational

institutions to "maintain[] separate living facilities for the different sexes," 20 U.S.C. § 1686, and the implementing regulations allowed those institutions to "provide separate toilet, locker room, and shower facilities on the basis of sex," 34 C.F.R. § 106.33, the *Whitaker* decision displaced those Congressional and administrative agency actions based upon its own "[c]ommon sense" views of how privacy should be maintained in communal restrooms. *See* 858 F.3d at 1052-53. This substitution of the Court's own views, rather than deferring to the statutory and regulatory text, is inconsistent with the separation of powers.

## <u>CONCLUSION</u>

The School District respectfully requests that this Court reverse the preliminary injunction order, and for all other appropriate relief. (Dkts. 50, 65.)

Respectfully submitted,

/s/ *Philip R. Zimmerly*

Philip R. Zimmerly (#30217-06)
  – COUNSEL OF RECORD
Jonathan L. Mayes (#25690-49)
Mark A. Wohlford (#31568-03)
Bose McKinney & Evans LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
317-684-5000   Fax: 317-684-5173
pzimmerly@boselaw.com
jmayes@boselaw.com
mark.wohlford@boselaw.com

*Attorneys for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief conforms to Fed. R. App. P. 32 and Circuit Rule 32.

1.     This brief complies with the type-volume limitations set forth in Circuit Rule 32(c) because it contains 9,073 words based on the "Word Count" feature of Microsoft Word.

2.     This brief complies with the typeface and type style requirements set forth in Circuit Rule 32 because the brief has been prepared in a proportionally-spaced typeface using Microsoft Word in 12-point Century font.

Dated: June 13, 2022

*Philip R. Zimmerly*
Philip R. Zimmerly

## CERTIFICATE OF SERVICE

I, Philip R. Zimmerly, an attorney, hereby certify that on June 13, 2022, I caused the foregoing Brief of Defendants-Appellants to be filed electronically with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Pursuant to Circuit Rule 31(b), and upon notice of this Court's acceptance of the electronic brief for filing, I certify that I will cause 15 copies of the Brief of Defendants-Appellants to be transmitted to the Court within 7 days of that notice date.


*Philip R. Zimmerly*

Philip R. Zimmerly
BOSE MCKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204

*Counsel for Defendants-Appellants*

No. 22-1786

_____

United States Court of Appeals
For the Seventh Circuit

_____

A.C., a minor child by his next friend,     ]
mother and legal guardian, M.C.,     ]
     ]
       Plaintiff-Appellee,     ]
     ]
v.     ]
     ]
METROPOLITAN SCHOOL DISTRICT OF,     ]
MARTINSVILLE, and PRINCIPAL,     ]
JOHN R. WOODEN MIDDLE SCHOOL,     ]
in his official capacity,     ]
     ]
       Defendants-Appellants.     ]

_____

SHORT APPENDIX OF DEFENDANTS-APPELLANTS

_____

Jonathan L. Mayes
Philip R. Zimmerly
Mark Wohlford
BOSE MCKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
(317) 684-5000

*Counsel for Appellants*

## Statement of Compliance with Circuit Rule 30(d)

All of the materials required by Circuit Rule 30(a) & (b) are included in this appendix. Pursuant to Circuit Rule 30(b)(7), because the materials placed in the appendix do not exceed 50 pages, the materials required by Circuit Rule 30(a) & (b) are included in the appendix bound with the brief.

_Philip R. Zimmerly_
Philip R. Zimmerly
BOSE MCKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204

*Counsel for Appellants*

## Table of Contents

April 29, 2022 Order on Plaintiff's Motion for Preliminary Injunction
  (Dkt. 50)……………………………………………………………….. A1-A16

May 19, 2022 Preliminary Injunction
  (Dkt. 65)……………………………………………………….… A17-A18

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| A. C. a minor child, by his next friend, mother and legal guardian, M.C., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Case No. 1:21-cv-02965-TWP-MPB |
| METROPOLITAN SCHOOL DISTRICT OF MARTINSVILLE, and PRINCIPAL, JOHN R. WOODEN MIDDLE SCHOOL in his official capacity, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

This matter is before the Court on a Motion for Preliminary Injunction filed pursuant to Federal Rule of Civil Procedure 65 by Plaintiff A.C. a minor child, by his next friend, mother and legal guardian, M.C. ("A.C."). (Filing No. 9.) A.C. initiated this lawsuit against Defendants Metropolitan School District of Martinsville and Principal of John R. Wooden Middle School in his official capacity (collectively, the "School District") seeking declaratory and injunctive relief for violations of Title IX and the Equal Protection Clause of the Fourteenth Amendment. (Filing No. 1.) A.C. seeks to enjoin the School District from restricting his use of male restrooms and requests that Defendants treat him as a male student in all respects. For the following reasons, the Court **grants** the Motion for Preliminary Injunction.

## I.     **BACKGROUND**

A.C. is a transgender, 13-year-old boy who lives with his mother, M.C., in Martinsville, Indiana. (Filing No. 30 at 9.) Though designated a female at birth, when A.C. was 8 years old he realized he identified as a boy. *Id.* When he turned 9 years old, A.C. told his mother that he was not a girl and wanted to be referred to by a boy's name and addressed using male pronouns. *Id.*

From that point, A.C. was referred to by his preferred name and addressed with "he" or "they" pronouns.  *Id.*  A.C. also began presenting himself as a boy, wearing masculine clothing and having a masculine haircut.  *Id.*  Around this same time, A.C.'s mother contacted his grade school and asked that teachers refer to him by his preferred name and use male pronouns.[1]  *Id.* at 10.

A.C. has been given the clinical diagnosis of gender dysphoria, a condition that occurs when there is a marked incongruence between a person's experienced gender and their gender assigned at birth, and is accompanied by clinically significant distress or impairment in areas of their functioning.  (Filing No. 29-1 at 4.) He is under the care of physicians at the Gender Health Clinic at Riley Children's Hospital where he is being given medication for menstrual suppression; and he hopes and expects to be taking male hormones in the near future.

When A.C. began school at John R. Wooden Middle School, located within the Metropolitan School District of Martinsville, he was offered the use of the school's single-sex restroom located in the school's medical clinic.  (Filing No. 30 at 11.)  This accommodation, however, was not convenient for A.C. as he felt singled out and the clinic restroom was far from most of his classes.  Because of the distance of the restroom, A.C. was marked tardy several times, which could have resulted in possible discipline.  *Id.* at 11.  A.C. began to experience anxiety, depression and stigmatization.  Due to his struggles, A.C.'s stepfather called the School District and requested that A.C. be allowed to use the boys' restroom. (Filing No. 35 at 6.) The School District denied this request and stated A.C. could continue using the clinic's restroom.  *Id.*

Over the frustration with the restroom access, M.C. contacted a transgender advocacy group, GenderNexus, to assist in advocating to the School District on A.C.'s behalf. (Filing No. 30

---

[1] In his opening brief, A.C. also brought claims based on staff members and substitutes referring to A.C. with his previous name and using feminine pronouns.  In his reply he withdrew these claims as a basis for the preliminary injunction.

at 12.) A representative from GenderNexus arranged and attended a meeting between M.C., A.C., and the School District. *Id.* The representative provided information about A.C.'s rights as a transgender student and the group discussed the need for A.C. to use the boys' restroom. *Id.* At the end of the meeting, a school counselor said he would ask "higher-ups" about the restroom request. *Id.* After conferring with the principal of the middle school, M.C. was advised that the School District would not allow A.C. to use the boys' restroom, but that it would no longer discipline A.C. for being late to class. *Id.* The counselor also noted that the School District was willing to allow A.C. to switch to remote learning. *Id.*

Contrary to the School District 's decision, A.C. began using the boys' restrooms after the meeting. *Id.* at 13. During the three weeks he was able to use the boys' restrooms, A.C. reported that he felt more comfortable at school, his attitude changed completely, and he felt better about himself. Additionally, there were no reported issues or complaints from A.C.'s classmates. *Id.* A staff member, however, saw A.C. using a boys' restroom and reported it to the administration. (Filing No. 35 at 8.) A.C. was called in for a meeting with the school counselor who reminded him that he was not allowed to use the boys' restrooms and would be punished if he continued to do so. (Filing No. 30 at 13.) The School District also advised staff that students should only be using the restrooms of the sex each student was assigned at birth or the clinic restroom. *Id.* Staff were also told to notify the front office when a transgender student requested to use the restroom during class so that student could be monitored for compliance with this policy. *Id.*

The week after his meeting with the school counselor, A.C. was called to the office to meet with the principal. *Id.* The principal told A.C. that he was not allowed to use the boys' restrooms, that he must only use the girls' restrooms or the one located in the clinic, and that he would be punished if he continued using the boys' restrooms. *Id.* at 13-14. M.C. was called during that

meeting and told that if she wanted A.C. to use the boys' restroom, she would need to contact the school board. *Id.* at 14.

Though it was never mentioned to A.C. or his parents prior to initiating this litigation, the School District has an unofficial policy for allowing transgender students to use the bathroom that aligns with their gender on a "case-by-case" basis. *Id.* The factors used by the School District in making these decisions include how long the student has identified as transgender; whether the student is under a physician's care; if the student has been diagnosed with gender dysphoria; if the student is prescribed hormones; and if the student has filed for a legal name and gender marker change. *Id.* After learning about this policy, A.C. submitted documentation from his supervising physician, Dr. Dennis Fortenberry. *Id.* Dr. Fortenberry has not had any direct discussions with A.C., however, he is the supervising doctor at the Gender Health Clinic at Riley Children's Hospital. (Filing No. 29-1.) The School District, however, has not granted A.C. access to the boys' restrooms since receiving this information from Dr. Fortenberry. (Filing No. 30 at 14.) As a result, A.C. reports that his education is being disrupted, "he dreads going to school, is unable to focus there, and comes home depressed and humiliated." *Id.* at 15. And despite the physical discomfort, A.C. sometimes tries to go the entire day without using the restroom at all.

## II.      LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (citation and quotation marks omitted). Granting a preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except

in a case clearly demanding it." *Roland Mach Co. v. Dresser, Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (citation and quotation marks omitted).

> To obtain a preliminary injunction, a plaintiff must establish that it has some likelihood of success on the merits; that without relief it will suffer irreparable harm. If the plaintiff fails to meet any of these threshold requirements, the court must deny the injunction. However, if the plaintiff passes that threshold, the court must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest.

*Geft Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (citations and quotation marks omitted).  Courts in the Seventh Circuit employ a sliding scale approach where the greater the likelihood of success, the less harm the moving party needs to show to obtain an injunction, and vice versa.  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.,* 549 F.3d 1079, 1086 (7th Cir. 2008).

### III.   **DISCUSSION**

At this stage of the case, the only issue before this Court is whether A.C. is entitled to the preliminary injunctive relief he seeks; specifically, to use the boys' restrooms at his school.[2]  To obtain a preliminary injunction, A.C. must establish the following factors: (1) that he is likely to succeed on the merits of both his Title IX and Equal Protection claims; (2) that he has no adequate remedy at law; (3) that he is likely to suffer irreparable harm in the absence of preliminary relief; (4) that the balance of equities tip in his favor; and (5) issuing the injunction is in the public interest. *Geft*, 922 F.3d at 364.  The first two factors are threshold determinations.  "If the moving party meets these threshold requirements, the district court 'must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied.'"  *Stuller, Inc. v. Steak N Shake*

---

[2] In his Complaint, A.C. also requests that he be allowed to participate on the boys' soccer team, but given that soccer season is a number of months away, he elected to not seek injunctive relief on that issue.

*Enterprises, Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (quoting *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). The Court will address each factor in turn.

## A.   **Likelihood of Success on the Merits**

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). To support a Title IX claim, a plaintiff must show (1) that the educational institution intentionally discriminated against the plaintiff based on the plaintiff's sex, and (2) that "gender was a motivating factor in the decision to impose the discipline." *Doe v. Indiana Univ.-Bloomington*, 2019 WL 341760, at *8 (S.D. Ind. Jan. 28, 2019) (quoting *King v. DePauw Univ.*, 2014 WL 4197507, at *10 (S.D. Ind. Aug 22, 2014)). The formative question the Court must answer is "do the alleged facts, if true, raise a plausible interference that [the School District] discriminated against [A.C.] on the basis of sex?" *Doe v. Purdue Univ.*, 928 F.3d 652, 667-668 (7th Cir. 2019).

The Seventh Circuit has held that discrimination against a person on the basis of their transgender status constitutes discrimination based on sex, which is prohibited by both Title IX and the Equal Protection Clause. (Filing No. 30 at 16-17.) In *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Education*, 858 F.3d 1034 (7th Cir. 2017), a transgender student alleged that a policy barring him from using the boys' restroom violated Title IX and the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 1039. The district court granted a preliminary injunction in favor of the student, and the Seventh Circuit agreed. *Id.* The Seventh Circuit held that a school policy that subjects transgender students to different rules, sanctions, and treatment than non-transgender students violates Title IX. *Id.* at 1049-50.

A06

A.C. contends that the Seventh Circuit's decision in *Whitaker* "makes plain that denying A.C. the ability to use the boys' restrooms in his school violates Title IX." (Filing No. 30 at 19.) "A policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX . . . . Providing a gender-neutral alternative is not sufficient to relieve the School District from liability, as it is the policy itself which violates the Act." *Whitaker*, 858 F.3d at 1049-50. A.C. asserts that just like in *Whitaker¸* the School District is punishing him for his transgender status and, as the Seventh Circuit has made clear, this violates Title IX.  (Filing No. 30 at 21.)

A.C. argues that he will succeed on his Equal Protection claim.  *Id.* at 25.  As his status as transgender is a classification based on sex, he contends the School District's action is subjected to a form of heightened scrutiny that is somewhere in between rational basis and strict scrutiny. *Id.*  With intermediate scrutiny, "the burden rests with the state to demonstrate that its proffered justification is exceedingly persuasive," which requires the state to show that the "classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."  *Whitaker*, 858 F.3d at 1050-51.

A.C. contends the decision of the School District to deny A.C. access to the boys' restrooms was based on concerns about "privacy."  *Id.* at 26-27.  He points out that in *Whitaker* the court addressed alleged privacy concerns, rejected those concerns and determined that they were "insufficient to establish an exceedingly persuasive justification for the classification." *Id.* Other courts have reached the same conclusions, both for other transgender students seeking restroom access, as well as for non-transgender students seeking to prohibit students from using the restrooms associated with their gender identities.  *Id.* at 28 (citing *Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020); *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d

A07

Cir. 2018)).  For all these reasons, A.C. contends that he will also be successful on his equal protection claim.

In response, the School District argues that A.C.'s request to use the boys' restrooms is unlikely to succeed because Title IX expressly allows institutions to provide separate restroom facilities on the basis of sex.  (Filing No. 35 at 13.)  The School District contends that Title IX's implementing regulations expressly state that institutions "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."  34 C.F.R. § 106.33. The School District asserts that Title IX expressly permits the segregation of facilities on the basis of enduring biological differences in areas where biological differences matter.  (Filing No. 35 at 14.)  Arguing that it is consistent with these regulations, the School District argues that it is complying with Title IX.  *Id.*

The School District argues that A.C. overly relies on the Seventh Circuit's decision in *Whitaker* and that it should be disregarded for four reasons.  *Id.* at 16.  First, the Seventh Circuit has criticized *Whitaker* for using the wrong standard of review.  *Id.* (citing *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762-63 (7th Cir. 2020)).  Because of this, the School District argues that the discussion of the merits in *Whitaker* should have no precedential value.  *Id.*

Second, the School District argues that the court's analysis in *Whitaker* is put in doubt by the United States Supreme Court's decision in *Bostock v. Clayton Cnty, Georgia*, 140 S. Ct. 1731 (2020).  *Id.* While the Seventh Circuit looked to Title VII in deciding *Whitaker*, the School District contends that in *Bostock*, the court expressly declined to extend its ruling as it pertained to sex discrimination in the workplace (which is prohibited by Title VII) to issues pertaining to sex assigned restrooms and locker rooms (which are expressly permitted by Title IX).  *Id.*

Third, the School District argues that the *Whitaker* analysis assumed that the sex stereotyping framework borrowed from Title VII applies in the Title IX restroom context, which *Bostock* does not embrace.  *Id.* at 17.  The School District asserts that the Supreme Court "specifically reserved this very issue for another day, and *Whitaker* offers no help in understanding why the distinction is 'on the basis of sex.'"  *Id.*  The School District contends that if requiring students to use restrooms based on sex is unlawful sex stereotyping, then Title IX is itself unlawful. *Id.*

And finally, the School District argues that its position cannot be characterized as sex stereotyping.  The School District contends that, consistent with Title IX and its regulations, the School District's position is based on Title IX allowing schools to separate restroom facilities on the basis of sex.  *Id.*  The School District also asserts that this aligns with the testimony of A.C.'s own expert, who acknowledges that sex is different than gender.  *Id.*

The School District also argues that A.C. will not be successful on his Equal Protection claim.  *Id.* at 18.  The School District agrees that its classification is subject to intermediate scrutiny, but that it can meet the two requirements: (1) that the classification serves important governmental objectives; and (2) the discriminatory means employed are substantially related to the achievement of those objectives. *Id.* (citing *United States v. Virginia*, 518 U.S. 515, 533 (1996)).

The School District first contends that the policy or practice of separate facilities "serves important objectives of protecting the interests of students in using the restroom away from the opposite sex and in shielding their bodies from exposure to the opposite sex." *Id.*  Citing a variety of cases on the issue of privacy, the School District argues that if the approach to protect privacy does not satisfy constitutional scrutiny, then neither does Title IX's facilities provisions. *Id.* at 19.

Next, the School District argues that its policy is also substantially related to the achievement of these objectives, as it requires that students use the restroom in a separate space from the opposite sex and that this protects against exposure of a student's body to the opposite sex. *Id.* The School District argues that this position does not violate Equal Protection and weighs against granting an injunction. *Id.* at 19-20. Additionally, the School District asserts that any reliance on the Seventh Circuit's decision in *Whitaker* is unreliable as the "analysis wrongly applies Title VII jurisprudence in an area in which the U.S. Supreme Court has not yet gone." *Id.* at 20.

The School District lastly argues that, to the extent *Whitaker* applies, its position of making an individualized determination as to whether a student who identifies as transgender will be allowed access to restrooms different than their sex complies with the law. *Id.* The School District was not provided the type of information it needed prior to the initiation of the lawsuit. *Id.* at 21. Additionally, unlike the plaintiff in *Whitaker* who was a high schooler, the School District A.C. is only a seventh grader and is "less mature" and only "on the threshold of awareness of human sexuality." *Id.* A.C. has not received hormones and at the time this action was filed, he had not completed a legal name and gender marker change. *Id.* At the time of oral argument, A.C.'s legal name change had been granted by the state court; however, on the same day as oral arguments, his gender marker change request was denied by the state court. (Filing No. 41.) Given these differences, as well as the Supreme Court failing to discuss or decide the issue in *Bostock*, the School District argues that it complied with the law in its initial determination to deny A.C. access to the boys' restrooms and in continuing to seek additional information that may alter that determination. (Filing No. 35 at 21.)

The Court finds that A.C. has established a likelihood of success on the merits of his claims. For all its arguments presented both in its briefing and at oral argument, the School District has

provided no convincing argument that *Whitaker* does not control and favors A.C.'s likely success on his claims. Whitaker remains good law and thus is binding on this court.[3]

And the School District appears to confuse its Title IX compliance of maintaining separate sex restrooms with the claims A.C. is alleging in this case.  A.C.'s claims are based on the School District's treatment of him as an individual, not a complaint that the School District lacks appropriate facilities.  A.C. has not requested that additional facilities be built, or the current ones be redesignated in any way.  Rather, he is seeking to use those facilities that already exist and align with his gender identity; his claim is solely that the School District is forbidding him from doing so.

Additionally, the School District's arguments that it was not provided enough information prior to the initiation of this lawsuit, as well as its arguments about A.C. not receiving hormones and a gender marker change, fail to undermine the likely success of A.C.'s claims.  The School District's transgender policy is unwritten and was not provided to A.C. until *after* the initiation of this lawsuit.  Further, there was no evidence presented that taking hormones and receiving a gender marker change on one's birth certificate are required prerequisites to identify as a transgender person, much less that either of these factors would automatically authorize A.C. to use the boys' restrooms.  In fact, at oral argument, counsel for the School District was unable to say whether a gender marker change or receiving hormones would be enough for the School District to change its decision regarding A.C. using the boys' restrooms.  Instead, counsel was only able to say that he thought it would have "significant impact" on the decision.

---

[3] The Court perceives that the School District is aware of the controlling nature of *Whitaker* given that at oral argument counsel for the School District admitted that this Court "isn't in a position to overrule *Whitaker*" and made clear that the arguments were being presented "for the purposes of our record . . . if this did go up on appeal."

Given the evidence before this Court and the controlling precedent from the Seventh Circuit, the Court finds that A.C. has established a likelihood of success on the merits of both his Title IX and Equal Protection claims.

**B.**    **Irreparable Harm, Inadequate Remedy at Law, and Balance of Harms**

As argued by A.C., it is well-established that the denial of constitutional rights is irreparable harm in and of itself.  (Filing No. 30 at 29.)  Based on a violation of his equal-protection rights, A.C. contends that he has established irreparable harm.  *Id.* at 30.  Additionally, A.C. asserts that he has established that the School District 's actions caused him ongoing emotional harm and distress, for which there is no adequate remedy at law.  *Id.*

A.C. also argues that because he has established a substantial likelihood of success on the merits, "no substantial harm to others can be said to inhere" from the issuance of an injunction.  *Id.* at 32 (citing *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville*, 274 F.3d 377, 400 (6th Cir. 2001)). An injunction will only force the School District to conform its conduct to the requirements of the Constitution and federal law, which cannot be harmful to the School District.  *Id.*

In response, the School District argues that the balance of harms weighs against A.C.'s request to have access to the boys' restrooms.  (Filing No. 35 at 22.)  The School District notes that it has made accommodations to allow A.C. more time to use the restroom, and the fact that he may occasionally be late to class is not evidence of irreparable harm.  *Id.*  The School District disputes that A.C. has been ostracized for the use of the clinic's restroom, and points out that unlike the single restroom accessible for Whitaker which invited more scrutiny and attention from peers, the clinic restroom is available for use by all students with permission from the school nurse.  *Id.* It argues Concerning A.C.'s expert, the School District asserts that Dr. Fortenberry,

> has not participated in the care of A.C., has not had any direct discussion with A.C. or M.C., has not performed any individualized assessment as to the severity of harm

12

that A.C. will experience if not allowed to access the boys' restroom, and has not performed an individualized assessment of the reduction of harm if A.C. is allowed access to the boys' restroom.

*Id.* Finally, the School District argues the balance of harms analysis favors maintaining the status quo. *Id.* at 23. Granting "unrestricted access" to A.C. to use the boys' restrooms would violate the privacy interests of other students and classmates, as well as cause the School District to be unable to rely on Title IX's regulations. *Id.*

The Court is not persuaded by the School Districts arguments. Although any student may use the restroom in the clinic, in order to do so the student (including A.C.) must enter the health clinic, ask permission from the school nurse and then sign in before they may use that restroom. This process appears to invite scrutiny and attention. In support of his Motion, A.C. provided a declaration in which he described feeling stigmatized and that being excluded from the boys' restrooms "worsens the anxiety and depression" caused by his gender dysphoria and makes him feel isolated. (Filing No. 29-3 at 5.) He affirms that the School District's decision "makes being at school painful." *Id.* A.C.'s mother also reported that the issues with the restroom have been emotionally harmful to A.C. and that she is concerned for the possible medical risks associated with him trying not to use the restroom during school. (Filing No. 29-2 at 6.) Like other courts recognizing the potential harm to transgender students, this Court finds no reason to question the credibility of A.C.'s account and that the negative emotional consequences with being refused access to the boys' restrooms constitute irreparable harm that would be "difficult—if not impossible—to reverse." *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 323 F. Supp. 3d 1030, 1039 (S.D. Ind. 2018) (quoting *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011). Likewise, a presumption of irreparable harm exists for some constitutional violations. *See Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011).

Additionally, the Court finds that there is no adequate remedy at law to compensate A.C. for the harm he could continue to experience.  While monetary damages may be adequate in the case of tort actions, the emotional harm identified by A.C. could not be "fully rectified by an award of money damages."  *J.A.W.*, 323 F. Supp. 3d at 1039-40; *see also Whitaker*, 858 F.3d at 1054.

Finally, the Court must evaluate the balance of harms to each party. While A.C. has provided evidence of the harm he will likely suffer, the School District's alleged potential harm is unsupported.  No student has complained concerning their privacy.  The School District's concerns with the privacy of other students appears entirely conjectural.  No evidence was provided to support the School District's concerns, and other courts dealing with similar defenses have also dismissed them as unfounded. *See Whitaker*, 858 F.3d at 1052; *J.A.W.*, 323 F. Supp. 3d at 1041. Moreover, the School District's concerns over privacy are undermined given that it has already granted permission for other transgender students to use the restroom of their identified gender, and it has presented no evidence of problems when the other transgender student have used restrooms consistent with their gender identity.

Because A.C. has demonstrated that he will likely suffer irreparable harm, and the School District has failed to support its claims of prospective harm, the Court finds that the balance weighs in favor of granting A.C.'s request.

## C.   <u>Public Interest</u>

Finally, A.C. argues that "[t]he public interest is also furthered by the injunction here, as an injunction in favor of constitutional rights and the rights secured by Title IX is always in the public interest. (Filing No. 30 at 33.) In response, the School District argues that public policy weighs in its favor.  Based on its assertion that Title IX favors the separation of facilities, the School District contends that its policy furthers the interest of personal privacy. (Filing No. 35 at

A14

24.) The School District argues "[t]o the extent that Title IX should not allow the separation of such facilities, that decision should be made through elected representatives in Congress, using clearly understood text, or through the notice and comment process for the revision of federal regulations required by the Administrative Procedure Act." *Id.*

While acknowledging that the public interest favors furthering individual privacy interests, the Court does not believe that granting A.C. access to the boys' restrooms threatens those interests. The restrooms at the middle school have stalls and as argues by A.C.'s counsel, restrooms are an area where people are usually private which minimizes exposure of a student's body to the opposite sex. Since he was eight years old, A.C. has identified as male, and has dressed as a boy and had a boy haircut. He is under a physician's care, has been diagnosed with gender dysphoria, and has been granted a legal name. The School District's arguments regarding its facilities again confuses the basis of A.C.'s claim, which is solely based on the School District's treatment of him as an individual. Having determined that granting A.C.'s Motion is in the public interest, as well as A.C. establishing the other required factors, the Court finds that A.C.'s requested preliminary injunction should be **granted**.

## IV.    CONCLUSION

The overwhelming majority of federal courts—including the Court of Appeals for the Seventh Circuit— have recently examined transgender education-discrimination claims under Title IX and concluded that preventing a transgender student from using a school restroom consistent with the student's gender identity violates Title IX. This Court concurs. For the reasons stated above, A.C.'s Motion for Preliminary Injunction (Filing No. 9) is **GRANTED**. The School District shall permit A.C. to use any boys' restroom within John R. Wooden Middle School.

**SO ORDERED.**

Date:   4/29/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Stevie J. Pactor
ACLU OF INDIANA
spactor@aclu-in.org

Kathleen Belle Bensberg
Indiana Legal Services
kathleen.bensberg@ilsi.net

Megan Stuart
INDIANA LEGAL SERVICES, INC. (Bloomington)
megan.stuart@ilsi.net

Jonathan Lamont Mayes
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
jmayes@boselaw.com

Mark Wohlford
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
mwohlford@boselaw.com

Philip R. Zimmerly
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
pzimmerly@boselaw.com

A16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| A. C. a minor child, by his next friend, mother and legal guardian, M.C., ) ) ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:21-cv-02965-TWP-MPB |
| ) | |
| METROPOLITAN SCHOOL DISTRICT OF MARTINSVILLE, PRINCIPAL, JOHN R. WOODEN MIDDLE SCHOOL in his official capacity, ) ) ) ) ) | |
| ) | |
| Defendants. ) | |

## <u>PRELIMINARY INJUNCTION</u>

Pursuant to the Court's Order Granting Plaintiff A.C. a minor child, by his next friend, mother and legal guardian, M.C.'s ("A.C.") Motion for Preliminary Injunction (Filing No. 50) and in compliance with Federal Rule of Civil Procedure 65(d)(1)(C), Defendants the Metropolitan School District of Martinsville and Principal of John R. Wooden Middle School are hereby preliminary enjoined from stopping, preventing, or in any way interfering with A.C. freely using any boys' restroom located on or within the campus of John R. Wooden Middle School located in Martinsville, Indiana. No bond shall be required.

**SO ORDERED**.

Date:   5/19/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

Roger A.G. Sharpe, Clerk

BY:

Deputy Clerk, U.S. District Court

1

A17

Distribution:

Kathleen Belle Bensberg
Indiana Legal Services
kathleen.bensberg@ilsi.net

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Jonathan Lamont Mayes
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
jmayes@boselaw.com

Stevie J. Pactor
ACLU OF INDIANA
spactor@aclu-in.org

Megan Stuart
INDIANA LEGAL SERVICES, INC. (Bloomington)
megan.stuart@ilsi.net

Mark Wohlford
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
mwohlford@boselaw.com

Philip R. Zimmerly
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
pzimmerly@boselaw.com

A18