IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

No. 22-1786

A.C., a minor child by his next friend, mother, and legal guardian M.C.,

Plaintiff/Appellee

v.

METROPOLITAN SCHOOL DISTRICT OF MARTINSVILLE, *et al.*,

Defendants/Appellants

On Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division
No. 1:21-cv-2965-TWP-MPB
The Honorable Tanya Walton Pratt, Chief Judge

BRIEF OF APPELLEE AND SUPPLEMENTAL APPENDIX

Kenneth J. Falk
*Counsel of Record*
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059

Megan Stuart
Indiana Legal Services
214 S. College Ave., 2nd Floor
Bloomington, IN 47404
812/961-6902

Kathleen Bensberg
Indiana Legal Services
1200 Madison Ave.
Indianapolis, IN 46225
317/631-9410

Attorneys for Plaintiff/Appellee

**Save As**    **Clear Form**

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>22-1786</u>

Short Caption: <u>A.C. v. Metropolitan School District of Martinsville</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>A.C., a minor child by his next friend, mother, and legal guardian M.C.</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>ACLU of Indiana by Kenneth Falk and Stevie Pactor</u>

<u>Indiana Legal Services by Megan Stuart and Kathleen Bensberg</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

<u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

<u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>s/ Kenneth J. Falk</u>    Date: <u>May 5, 2022</u>

Attorney's Printed Name: <u>Kenneth J. Falk</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [✔]  **No** [ ]

Address: <u>ACLU of Indiana, 1031 E. Washington St.</u>

<u>Indianapolis, IN 46202</u>

Phone Number: <u>317/635-4059</u>    Fax Number: <u>317/635-4105</u>

E-Mail Address: <u>kfalk@aclu-in.org</u>

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1786

Short Caption: A.C. v. Metropolitan School District of Martinsville

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

   A.C., a minor child by his next friend, mother, and legal guardian M.C.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   ACLU of Indiana by Kenneth Falk and Stevie Pactor

   Indiana Legal Services by Megan Stuart and Kathleen Bensberg

(3)    If the party, amicus or intervenor is a corporation:

   i)    Identify all its parent corporations, if any; and

      N/A

   ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: s/ Stevie J. Pactor          Date:  May 5, 2022

Attorney's Printed Name:  Stevie J. Pactor

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [ ]    **No** [✓]

Address:  ACLU of Indiana, 1031 E. Washington St.

   Indianapolis, IN 46202

Phone Number: 317-635-4059          Fax Number:  317-635-4105

E-Mail Address: spactor@aclu-in.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Save As     Clear Form

Appellate Court No: 22-1786

Short Caption: A.C. v. Principal, John R. Wooden Middle School, et al

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
A.C., a minor child by his next friend, mother, and legal guardian M.C.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
ACLU of Indiana by Kenneth Falk and Stevie Pactor

Indiana Legal Services by Megan Stuart and Kathleen Bensberg

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and
        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
        n/a

(4)    Provide information required by FRAP 26.1(b) - Organizational Victims in Criminal Cases:
    n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
    n/a

Attorney's Signature: /s/ Megan Stuart    Date: 5/5/2022

Attorney's Printed Name: Megan Stuart

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [ ]    No [✔]

Address: Indiana Legal Services, 214 S. College Ave, 2nd Floor

Bloomington, IN 47404

Phone Number: 812-961-6902    Fax Number: 812-961-6903

E-Mail Address: megan.stuart@ilsi.net

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1786

Short Caption: A.C. v. Metropolitan School District of Martinsville

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

A.C., a minor child by his next friend, mother, and legal guardian M.C.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

ACLU of Indiana by Kenneth Falk and Stevie Pactor

Indiana Legal Services, Inc. by Megan Stuart and Kathleen Bensberg

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/Kathleen Bensberg    Date: May 5, 2022

Attorney's Printed Name: Kathleen Bensberg

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: 1200 Madison Ave., Suite 300

Indianapolis, IN 46225

Phone Number: (317) 744-5799    Fax Number: (317) 631-9775

E-Mail Address: kathleen.bensberg@ilsi.net

rev. 12/19 AK

# Table of Contents

Table of Contents ................................................................... i

Table of Authorities ............................................................... iii

Jurisdictional Statement ........................................................ 1

Statement of the Issues ......................................................... 1

Statement of the Case .......................................................... 2

    I.    Factual background ........................................... 2

        A.    Introduction to A.C. .................................... 2

        B.    Access by A.C. to his school's boys' restrooms ........... 6

        C.    Gender dysphoria and its treatment ............... 10

        D.    The importance of restroom access ................ 12

    II.    Procedural history .......................................... 14

Summary of the Argument .................................................... 16

Argument .......................................................................... 18

    I.    Standard of review ........................................... 18

    II.    This Court held in *Whitaker* that denying a transgender student the ability to use restrooms consistent with his gender identity is discrimination on the basis of sex ........................................ 19

    III.    The district court properly found that A.C. is likely to prevail on the merits of his claim that denying him access to the male restrooms violates Title IX ........................................ 20

    IV.    A.C. is likely to prevail on his equal protection claim ............. 25

        A.    Martinsville's exclusion of A.C. from the boys' restrooms is sex discrimination, triggering heightened scrutiny ... 25

        B.    Excluding A.C. from the boys' restrooms is not

substantially related to an important governmental objective ........................................................... 26

V.   There are no grounds to revisit *Whitaker* ................................. 30

A.   This Court's conclusions in *Whitaker* concerning Title IX are supported by the Supreme Court's decision in *Bostock* ........................................................... 30

B.   *Whitaker* does not contravene what Title IX allows ...... 33

C.   *Whitaker* is not undermined by the fact that it articulated the incorrect preliminary injunction standard.............. 37

VI.  The district court properly concluded that the other requirements for the grant of a preliminary injunction are met...................... 39

A.   A.C. is suffering irreparable harm for which there is no adequate remedy at law ................................... 39

B.   The balance of harms favors A.C. .................................. 41

C.   The public interest supports the issuance of the preliminary injunction...................................... 43

Conclusion........................................................................ 43

Certificate of Word Count.................................................. 45

Certificate of Service....................................................... 45

Supplemental Appendix – July 22, 2022 Order from the Monroe Circuit Court VI............................................................................. Supp. App. 1

# Table of Authorities

CASES:

*Adams v. School Board of St. Johns Co., Fla.* 3 F.4th 1299 (4th Cir. 2021), *vacated and en banc rehearing granted,* 9 F.4th 1369 (4th Cir. 2021) .................................. 25

*Adkins v. City of New York*, 143 F. Supp. 3d 139 (S.D.N.Y. 2015)............................... 29

*Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564 (1985)....................................... 18

*Bostock v. Clayton County, Georgia*, –U.S.–, 140 S. Ct. 1731 (2020) .................... *passim*

*Boston Alliance of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health & Human Servs.*, 557 F. Supp. 3d 224 (D. Mass. 2021 ................................. 38

*Brickhouse v. Lashbrook*, 2020 WL 7059256 (S.D. Ill. Dec. 2, 2020) ........................... 38

*Buchmeier v. United States*, 581 F.3d 561 (7th Cir. 2009) .............................................. 30

*C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*, 536 F. Supp. 3d 791 (W.D. Wash. 2021).................................................................................................................. 32

*Christian Legal Soc'y v. Walker*, 453 F.3d 853 (7th Cir. 2006) ..................................... 42

*Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019)................................. 18

*D.T. v. Christ*, 552 F. Supp. 3d 888 (D. Az. 2021) .......................................................... 38

*Dhakal v. Sessions*, 895 F.3d 532 (7th Cir. 2018)........................................................... 37

*Dodds v. United States Department of Education*, 845 F.3d 217 (6th Cir. 2016) .......... ........................................................................................................................... 24, 43

*Doe ex rel. Doe v. Boyertown Area School District*, 897 F.3d 518 (3d Cir. 2018) ........... ....................................................................................................................... 23, 28, 29

*Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022) ................................................................... 32

*Evancho v. Pine-Richland School Dist.*, 237 F. Supp. 3d 267 (W.D. Pa. 2017) ............. ........................................................................................................................... 29, 41

*F.V. v. Barron*, 286 F. Supp. 3d 1131 (D. Idaho 2018.........................................29

*Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60 (1992)..........................33

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *cert. denied*,
   –U.S.–, 141 S. Ct. 2878 (2021) ...........................................................*passim*

*Hobby Lobby Stores, Inc. v. Sommerville*, 186 N.E.3d 67 (Ill. Ct. App. 2021)
   *appeal allowed*, 183 N.E.3d 880 (Ill. 2021) ...................................38

*Houlihan v. City of Chicago*, 871 F.3d 540 (7th Cir. 2017) .............................3

*lllinois Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020) ..............37

*In re Change of Gender Identification of A.B.*, 164 N.E.3d 167 (Ind. Ct. App. 2021)..23

*In re: the Change of Gender of: O.J.G.S., A Minor*, 187 N.E.3d 324 (Ind. Ct. App.
   2022)…………………………………………………………………………23

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ........................3

*Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) ........................................29

*Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881 (1st Cir. 1988)........................33

*Love v. Young*, 320 So. 3d 259 (Fla. Ct. App. 2021) ......................................38

*M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704 (D. Md. 2018)..........25, 29

*Mid-Con Freight Systems, Inc. v. Mich. Pub. Serv. Comm'n*, 545 U.S. 440 (2005)....34

*N.H. v. Anoka-Hennepin Sch. Dist. No. 11*, 950 N.W.2d 553 (N.H. Ct. App. 2020)...38

*Nelson v. Christian Bros. Univ.*, 226 Fed. App'x 448 (6th Cir. 2007) ..........................33

*North Haven Bd. of Ed. v. Bell*, 456 U.S. 512 (1982)........................................33

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) …………………………33

*Orr v. Shicker*, 953 F.3d 490 (7th Cir. 2020) ........................................41

*Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566 (6th Cir. 2002) .................................................................................................... 39

*Parents for Privacy v. Dallas Sch. Dist.*, 326 F. Supp. 3d 1075 (D. Or. 2018), *aff'd*, 949 F.3d 1210 (9th Cir. 2020), *cert. denied*, –U.S.–, 141 S.Ct. 894 (2020) ..................... 24

*Parents for Privacy,* 949 F.3d 1210 (9th Cir. 2020), *cert. denied*, –U.S–, 141 S. Ct. 894 (2020) ........................................................................................................ 28, 29

*Peltier v. Charter Day Sch., Inc.*, 37 F. 4th 104 (4th Cir. 2022) ..................................... 33

*Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963 (D. Minn. 2016) ........................... 39

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) ...................................................... 20

*Ray v. McCloud,* 507 F. Supp. 3d 925 (S.D. Ohio 2020) ................................................ 29

*S.E.C. v. Cherif,* 933 F.2d 403 (7th Cir. 1991) ................................................................. 3

*Skiba v. Ill. Cent. R.R.*, 884 F.3d 708 (7th Cir. 2018) ..................................................... 38

*Soule ex rel. Stanescu v. Conn. Ass'n of Schools, Inc.*, 2021 WL 1617206 (D. Conn. Apr. 25, 2021) ..................................................................................................... 38

*Spiegel v. Kim,* 952 F.3d 844 (7th Cir. 2020) ................................................................. 23

*Turnell v. CentiMark Corp.*, 796 F.3d 656 (7th Cir. 2015) ............................................. 19

*United States v. Price*, 383 U.S. 787 (1966) .................................................................. 33

*United States v. Rollins*, 862 F.2d 1282 (7th Cir. 1988) ................................................... 3

*United States v. Virginia*, 518 U.S. 515 (1996) ................................................. 17, 20, 26

*Walker v. Soo Line R. Co.*, 208 F.3d 581 (7th Cir. 2000) ................................................. 3

*Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017) ................................................................................................ *passim*

[v]

*Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013) ... 29

*Ybarra v. City of Chicago*, 946 F.3d 975 (7th Cir. 2020) .................................................. 37

STATUTES:

20 U.S.C. § 1681(a) ..................................................................................................... 1, 19

20 U.S.C. § 1686 ............................................................................................................. 36

28 U.S.C. § 1292(a)(1) ...................................................................................................... 1

28 U.S.C. § 1331 ............................................................................................................... 1

RULES:

Fed. R. Evid. 703 ............................................................................................................... 3

REGULATIONS:

34 C.F.R § 106.31(a)(2) (proposed) ................................................................................ 35

34 C.F.R. § 106.10 (proposed) ....................................................................................... 35

34 C.F.R. § 106.33 ............................................................................................... 33, 34, 35

OTHER AUTHORITIES:

Exec. Order No. 13988. 86 FR 7023, 2021 WL 229396 (Jan. 20, 2021) ...................... 35

Proposed Rule, *Nondiscrimination on the Basis of Sex in Education Programs of Activities Receiving Federal Financial Assistance*, 87 FR 41390-01, 2022 WL 266876(F.R.) (July 12, 2022) ..................................................................................... 35

## Jurisdictional Statement

The jurisdictional statement of the appellants is not complete and correct.

The district court had jurisdiction of this action pursuant to 28 U.S.C. § 1331. The district court's jurisdiction was based on alleged violations by defendants of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681(a), and the Equal Protection Clause of the Fourteenth Amendment.

The Court of Appeals has jurisdiction of this appeal pursuant to 28 U.S.C. § 1292(a)(1) as it is an appeal from the district court's grant of plaintiff's motion for a preliminary injunction. The district court issued its Order on Plaintiff's Motion for Preliminary Injunction on April 29, 2022 (Appellants' Short Appendix [S.A.] at A1) and issued a stand-alone Preliminary Injunction on May 19, 2022 (S.A. at 17). The merits of plaintiff's case remain to be resolved by the district court.

No motion was filed that tolls the time within which to appeal the preliminary injunction. The Notice of Appeal was filed on May 3, 2022. (District Court Docket ["Dkt."] 52). There are no prior or related appellate proceedings.

One of the defendants in this case is the Principal of the John R. Wooden Middle School, who is sued in his official capacity. The current principal is Fred Kutruff.

## Statement of the Issues

A.C. is a thirteen-year-old male middle-school student who has identified as a boy since he was eight. He is transgender, is diagnosed with gender dysphoria, and is under medical care to treat this condition. He has a history of depression and

anxiety. He consistently presents as male. Although appellants ("Martinsville") allow some transgender students in the high school to use the restrooms consistent with their gender identity, they have denied A.C. the ability to use the male restrooms in his public middle-school. The evidence is uncontested that this has caused A.C. a great deal of distress, anxiety, and physical discomfort.

The issue presented is whether the district court properly entered a preliminary injunction in this matter, allowing A.C. to use male restrooms, after concluding, as dictated by *Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017), *abrogation in nonrelevant part recognized by Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020), and consistent with *Bostock v. Clayton County, Georgia*, –U.S.–, 140 S. Ct. 1731 (2020), that he is likely to prevail on his claims that banning him from the restrooms violates both Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, *et seq.*, and the Equal Protection Clause of the United States Constitution.

## Statement of the Case

I.     Factual background

       A.     Introduction to A.C.

A.C. is a 13-year-old boy who lives with his mother, M.C., and family in Martinsville, Indiana. (Declaration of M.C. ["M.C. Dec."], Dkt. 29-2 at 1 ¶¶ 1-2). When the preliminary injunction was entered, he was a seventh grader at John R. Wooden Middle School in the Metropolitan School District of Martinsville. (*Id.* at 1 ¶ 3). The

school district is a recipient of federal funding. (Answer, Dkt. 28 at 13 ¶ 55).

A.C. is transgender. (Declaration of Dr. Dennis Fortenberry [Fortenberry Dec."] Dkt. 29-1 at 13 ¶ 42[1]; Declaration of A.C. ["A.C. Dec"] Dkt. 29- 3 at 1 ¶ 4.). He was designated female at birth but realized he was a boy when he was around 8 years old. *(*A.C. Dec. Dkt. 29-3 at 1 ¶ 4.) When he was around 9 years old, he told his mother, M.C., that he was not a girl and did not want to be referred to with female pronouns and wanted to be called a boy's name. (*Id.* at 1 ¶ 5; M.C. Dec. Dkt. 29-2 at 1-2 ¶¶ 5-6). From then on, A.C. was called by his male name and has used he/him pronouns. (M.C. Dec. Dkt. 29-2 at 1 ¶ 5; A.C. Dec. Dkt. 29-3 at 1-2 ¶¶ 5-6). Around this time A.C. began presenting himself as a boy with typically masculine clothing and

---

[1]     Martinsville cites to the objection that it made to Dr. Fortenberry's opinions based on hearsay, lack of personal knowledge, and lack of foundation. (Appellants' Br. at 31). The basis for this objection is not apparent as Dr. Fortenberry helped to found, and still works at, the Gender Health Program at Riley Children's Health, where A.C. receives treatment and which offers comprehensive medical, psychological, and social services support to children, teens, and young adults who have been diagnosed with gender dysphoria, and he personally provides or supervises each month the medical care of 40 or more children, adolescents, and young persons with gender dysphoria. (Fortenberry Dec. Dkt. 29-1 at 2, 13 ¶¶ 5-7, 41). He supervises A.C.'s medical care and reviewed A.C.'s medical records. (*Id.* at 3, 13 ¶¶ 9, 42). Moreover, Dr. Fortenberry is an expert and "hearsay may be admissible if the evidence relied on by the expert is the type of evidence that experts in that field normally rely on when forming their opinions." *United States v. Rollins*, 862 F.2d 1282, 1293 (7th Cir. 1988) (further citation omitted), *see also* Fed. R. Evid. 703. It is to be expected that a medical expert will rely on evidence acquired by other medical personnel. *See, e.g.*, *Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000) (noting that the lack of examination by a medical expert does not render testimony inadmissible as evaluation of the medical records is a reliable method of determining that a patient is ill, even without a physical examination) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 762 (3d Cir. 1994)). In any event, hearsay can be considered in a preliminary injunction proceeding. *S.E.C. v. Cherif,* 933 F.2d 403, 412 n.8 (7th Cir. 1991). The district court was properly unpersuaded by Martinsville's arguments concerning Dr. Fortenberry (S.A. at A13), and its ruling is certainly not an abuse of discretion. *See, e.g., Houlihan v. City of Chicago*, 871 F.3d 540, 552 (7th Cir. 2017) ("We review evidentiary rulings for abuse of discretion.") (further citation omitted).

haircuts. (A.C. Dec. Dkt. 29-3 at 2 ¶ 7). A.C.'s appearance has remained masculine, and he has continued to use his boy's name and masculine pronouns in daily life. (*Id.* at 1-2 ¶¶ 6-8; M.C. Dec. Dkt. 29-3 at 1-2 ¶¶ 6-8). Also, around this time M.C. contacted A.C.'s grade school and asked that teachers refer to him by his male name and with male pronouns. (M.C. Dec. Dkt. 29-2 at 2 ¶ 7). He is known and accepted by many of his peers as a boy. (*Id.* at 7 ¶ 34).

A.C. has been diagnosed with gender dysphoria and suffers from significant distress, depression, and anxiety related to the condition. (A.C. Dec. Dkt. 29-3 at 2 ¶ 9). Gender dysphoria is a recognized condition, codified in the American Psychiatric Association's Diagnostic and Statistical Manual, 5th edition ("DSM-V"), which is a standard classification of mental and physical disorders. (Fortenberry Dec. Dkt. 29-1 at 6 ¶ 21).[2] A.C. describes it as "distress and pain that comes from my body not

---

[2]     The DSM-V sets out the following criteria for gender dysphoria in adolescents and adults:

A.     A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months duration, as manifested by at least two of the following:

1.     A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated sex characteristics).

2.     A strong desire to be rid of one's primary/and or secondary sex characteristics because of a marked incongruence with one's experienced/ expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

3.     A strong desire for the primary and /or secondary sex characteristics of the other gender.

4.     A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

matching my gender." (A.C. Dec. Dkt 29-3 at 2 ¶ 9). When A.C. first disclosed that he was transgender, he received therapy from a mental health provider to address the psychological distress that he was suffering. (M.C. Dec. Dkt. 29-2 at 2 ¶ 11). When this did not alleviate his distress, he was referred to the Riley Hospital program where he continues to be seen. (*Id.* at 3 ¶ 13). As he has become older his symptoms have increased, causing depression, anxiety, anger, and self-harm as he is faced with a maturing body that does not match his gender identity. (*Id.* at 2 ¶ 12). To help address his gender dysphoria, his health professionals have prescribed hormonal suppression to block his menstrual periods. (A.C. Dec. Dkt. 29-3 at 2 ¶ 9; Fortenberry Dec. Dkt. 29-1 at 13 ¶ 45). He intends to start receiving testosterone when medically indicated. (A.C. Deposition ["A.C. Dep."] Dkt. 34-2 at 6 [30:14 – 31:15]).

Once A.C. was able to present himself to the world as a boy, some of his emotional and psychological distress decreased, although he continues in counseling. (M.C. Dec. Dkt. 29-2 at 2 ¶ 10; M.C. Deposition ("M.C. Dep.") Dkt. 38-2 at 4:16-20). Being treated as a boy makes him seem more like himself and makes him happier, lowering his depression and anxiety. (*Id.*). He is happiest in the summer when he is

---

5.    A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

6.    A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B.    The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

(Fortenberry Dec. Dkt. 29-1 at 6 ¶ 21).

out of school and no one treats him as if he were a girl. (*Id.*). However, when he is in school and is not treated as a boy, his depression and anxiety become progressively worse as the school year continues. (*Id.*).

One source of anxiety in his school life has been misgendering—being referred to by a girl's name and not the male name that he uses—which increases his dysphoria. (*Id.* at 3 ¶¶ 16-18; A.C. Dec. Dkt. 29-3 at 3-4 ¶¶ 12-18). Although the misgendering by school personnel was an issue that A.C. raised in his complaint (Complaint Dkt. 1 at 9 ¶¶ 58-59), school personnel have now been instructed to refer to A.C. by his male name and with male pronouns. (Kutruff Deposition ["Kutruff Dep."] Dkt. 29-4 at 34: 2-7). A.C. has received a legal name change from an Indiana court. (Dkt. 38-3).

B.    Access by A.C. to his school's boys' restrooms

When A.C. first told his mother that he was transgender, he was attending elementary school in Anderson, Indiana. (A.C. Dec. Dkt. 29-3 at 2 ¶ 10). He tried not to use the restroom at all at school because the only one that he was allowed to use was for girls. (*Id.*). After moving to Martinsville in the 5th grade, A.C. primarily used the single-person restroom in the school's health clinic—for which he had to ask permission from the guidance counselor in both 5th and 6th grades. (A.C. Dep. Dkt. 34-2 at 2 [12:8 – 13:16]).

In the 2021-2022 school year, A.C. started at the John R. Wooden Middle School, which contains the 7th and 8th grades. (*Id.* at 2 [13:17-20]; Kutruff Dep. Dkt. 29-4 at 8:11-14). At the beginning of the school year, he did not use the restroom at

all while he was at school. (*Id.* at 2 [13:21-25]). In September or early October, A.C.'s stepfather contacted the school and asked that he be permitted to use the boys' restroom. (M.C. Dec. Dkt. 29-2 at 4 ¶ 19). The request was denied and he was told that A.C. could use the girls' restrooms or the restroom in the health clinic. (*Id.*). The health clinic restroom contains a single toilet, designed for use by anyone. (Kutruff Dep. Dkt. 29-4 at 49:20-22). In order to use that restroom a student has to obtain permission and even A.C would have to sign in at the office to use it. (*Id.* at 51:18-22).

The regular student restrooms at the school are designed to be used during the students' four-minute passing periods, absent teachers allowing students to leave during class. (*Id.* at 48:8-23). These restrooms have multiple stalls and, as appropriate, multiple urinals. (*Id.* at 48:24 – 49:4). There are doors on the stalls and the urinals are separated by dividers. (*Id.* at 49:4-11).

Using the girls' restrooms is not an option as A.C. is a boy. (A.C. Dec. Dkt. 29-3 at 4 ¶ 23). Use of the clinic restroom proved problematic from a practical standpoint as it is far from A.C.'s classes and using it during the four-minute passing periods caused him to be late for classes, which resulted in him being marked tardy and subjected him to discipline. (*Id.* at 4 ¶¶ 20-21). Moreover, it singles him out as being different and does not allow him to be himself. (*Id.* at 4 ¶ 22).

Rather than use the girls' restrooms or the restroom in the health office, A.C. would try to avoid using the restroom at all. (*Id.* at 4 ¶22). Even though this caused him physical discomfort, it was better than being singled out as different. (*Id.*).

In the fall of 2021 M.C. asked GenderNexus, an advocacy organization for transgender people and their families, for help advocating with Martinsville. (M.C. Dec. Dkt. 29-2 at 4 ¶ 21). This resulted in a meeting on November 3, but Martinsville's position did not change – A.C. was not allowed to use the boys' restrooms. (*Id.* at 4 ¶ 22). However, Martinsville indicated that A.C. would no longer be disciplined for being late to class and it also offered to allow him to attend school at home via on-line education. (*Id.*).

Despite Martinsville's position, following the meeting A.C. did begin to use the boys' restroom. (*Id.* at 5 ¶ 24; A.C. Dec. Dkt. 29-3 at 4 ¶ 23). A.C.'s mother noticed an immediate and positive change when A.C. began using the boys' restrooms. (M.C. Dec. Dkt. 29-2 at 5 ¶ 24;  M.C. Dep. Dkt. 38-2 at 59:12-23). He felt more comfortable at school and felt better about himself as he was living as a boy. (M.C. Dec. Dkt. 29-2 at 5 ¶ 24). A.C.'s use of the restrooms, all with individual stalls with doors that close, caused no issues with other students and no student questioned his presence in the boys' restrooms. (Dkt. 29-3 at 5 ¶ 24). There were no student complaints. (Kutruff Dep. Dkt. 29-4 at 65:6-21).

However, when a staff member noticed that A.C. was using the boys' restroom, A.C. was instructed on November 22, 2021 that he was not to use the boys' restrooms and was told that if he did it again, he could be disciplined. (*Id.* at 65:22 – 66:25; Dkt. 29-3 at 5 ¶ 25). The school's principal met with A.C. the following week and reiterated that he was not allowed to use the boys' restroom and must only use the girls' restroom or the restroom in the health clinic and stated that A.C. would be punished

if he continued to use the boys' restroom. (Kutruff dep. Dkt. 29-4 at 67:11-24). Martinsville advised all staff that students may only use the restrooms of the sex assigned at birth or the clinic restroom. (Kutruff Dep. Dkt. No. 29-4 at 14:19-15:4, 82).

Though never mentioned to A.C. or M.C., Martinsville does ostensibly provide for transgender students' access to bathrooms that align with their gender identity on a "case-by-case basis." (M.C. Dec. Dkt. 29-2 at 5 ¶ 28; Kutruff Dep. Dkt. 29-4 at 15:17 - 16:14; 23:6-15; 28:5-22; 73:10 - 74:7). Martinsville will evaluate restroom requests based on how long the student has identified as transgender; whether the student is under a physician's care; if the student has been diagnosed with gender dysphoria; if the student was prescribed hormones; and if the student has filed for a legal name or gender marker change. (Kutruff Dep. Dkt. 29-4 at 23:12-24:5). Based on this unwritten policy, transgender students in Martinsville's high school are allowed to use restrooms that align with their gender identity. (*Id*. 23:6-15; 28:5-22).

Once A.C. and his mother learned that Martinsville allowed some transgender students to use restrooms consistent with their gender identity, they provided Martinsville a letter from Dr. Fortenberry to demonstrate that A.C. meets these criteria. (M.C. Dec. Dkt. 29-2 at 9). The letter specified that A.C. consistently identified as a boy for years, is under the care of the Gender Health Clinic at Riley Hospital and has gender dysphoria for which he is receiving treatment, including potentially hormones in the future. (*Id*.). Martinsville was also advised that the failure to allow A.C. to use the boys' restrooms, among other things, is a source of

significant distress, depression, and anxiety for him. (*Id.*). As is demonstrated by the continuing of this litigation, this did not change Martinsville's position concerning A.C.'s restroom access.

Not being able to use the boys' restrooms worsened the anxiety and depression caused by A.C.'s gender dysphoria, making him feel isolated and punished for who he is. (*Id.* at 5 ¶ 27). Martinsville's actions signaled to students that he is not a real boy and makes school painful. (*Id.*). Being treated as a boy at school is extremely important to A.C.'s mental and physical health and it causes him a great deal of discomfort and mental distress to be at school when he cannot be who he is. (*Id.* at 5 ¶ 28). It makes him unable to focus on learning, instead making him feel isolated and unable to be himself. (*Id.* at 6 ¶ 29). It also undermines the benefits he has obtained from his social transition, family support and medical care. (M.C. Dec. Dkt. 29-2 at 6 ¶ 32). A.C. is an intelligent child who gets good grades and loves learning. (*Id.* at 7 ¶ 36). He was formerly in the gifted and talented program, but now finds it hard to go to school because the school will not recognize him as the boy he is. (*Id.*). This is chronically disrupting both his education and life, leaving him depressed, humiliated, angry, and suffering emotionally, psychologically, and physically. (*Id.* at 7 ¶¶ 35-37). His anxiety and depression from not being accepted at school follow him home where he wants to isolate himself. (M.C. Dep. Dkt. 38-2 at 62:4-8).

C.     Gender dysphoria and its treatment

The term "gender identity" is a well-established medical concept that refers to one's sense of belonging to a particular gender. (Fortenberry Dec. Dkt. 29-1 at 4 ¶ 13).

For many people gender identity is congruent with one's anatomical features, such that many persons classified as male at birth later identify as male and many persons classified as female at birth later identify as female. (*Id.* at 4 ¶¶ 13-14).

However, persons who are transgender have a much different experience of gender. (*Id.* at 4 ¶ 14). Up to 0.6% of persons in Indiana are transgender, and recent research from the Centers for Disease Control and Prevention shows that up to 1.9% of high school students identify as transgender. (*Id.* at 4-5 ¶ 16). Transgender individuals have a gender identity that differs from their sex assigned at birth and this incongruence between a person's sex assigned-at-birth and gender identity can cause significant distress and may result in a gender dysphoria diagnosis. (*Id.* at 4-5 ¶¶ 15, 18, 21).   This conflict may arise at a very young age, although it often intensifies at puberty. (*Id.* at 4 ¶ 14).

The senses of distress underlying a gender dysphoria diagnosis presents through various symptoms and can, if untreated, result in clinically significant anxiety and depression, self-harming behaviors, substance abuse, and suicidality. (*Id.* at 5 ¶ 18). Research consistently demonstrates that the rates of attempted suicide for young persons with gender dysphoria is much higher than those who do not suffer with gender dysphoria. (*Id.* at 5 ¶ 19).

The standards for the treatment of gender dysphoria established by the World Professional Association for Transgender Health ("WPATH") are internationally recognized as the authoritative standards of care by leading medical and mental health organizations, including the American Medical Association, the Endocrine

Society, the American Psychological Association, and the American Psychiatric Association. (*Id.* at 5 ¶ 24). The WPATH Standards of Care recognize that the principal treatment of gender dysphoria is to allow the young person the full expression of their gender identity. (*Id.* at 6 ¶ 27). Treatment focuses on alleviating distress through supporting outward expression of the person's gender identity— which is social role transition—allowing young people to express their genders through names and pronouns and social behaviors consistent with their gender identity (*Id.* at 8-10 ¶¶ 27-28, 31, 34). Treatment may also involve bringing the person's body into alignment with their gender identity, to the extent deemed medically appropriate, although gender-affirming surgery is generally not performed on patients under the age of 18. (*Id.* at 9 ¶ 29). Counseling is often an important part of treatment, with its purpose being to assist the person with the depression, anxiety, and suicidality that may flow from gender dysphoria and being transgender and not being accepted by family, friends, and society. (*Id.* at 9-10 ¶ 32).

D. The importance of restroom access

The WPATH Standards of Care recognize that allowing for social role transition, so that the person may express themselves in a way that is consistent with their gender identity, is essential to ameliorate gender dysphoria. (*Id.* at 10 ¶ 34). Research shows that support for social role transition, particularly from family and social institutions such as schools, lessens the negative consequences of gender dysphoria. (*Id.* at 10-11 ¶ 35).

Research also demonstrates that school is the most traumatic aspect of

[12]

growing up for transgender youth. (*Id.* at 11 ¶ 36). Rejection and discrimination by teachers and school personnel lead to feelings of shame and unworthiness and create daily stigmatizing experiences. (*Id.*).

The importance of using restrooms that match a person's gender identity cannot be overstated, as it is a prime component of gender affirmation. (*Id.* at 11 ¶ 37). Being forced to use restrooms that differ from the person's identity is a constant source of anxiety and distress, leading to self-harming behaviors including suicidality. (*Id.*). Recent scholarship demonstrates that among transgender and nonbinary students denied access to restrooms consistent with their gender identity, 85% reported depression, 60% had serious thoughts of suicide, and about 33% reported that they had attempted suicide in the last year. (*Id.* at 11-12 ¶ 37). Gender dysphoric students denied access to restrooms consistent with their gender identity will restrict their liquids and suppress their bodily functions to avoid using the restroom at all while they are in school. (*Id.* at 12 ¶ 38). This can cause physical discomfort and injury. (*Id.*).

Reserving a "special" restroom solely for a transgender student, when there are sex-specific restrooms for other students, does not resolve the problems caused by barring the transgender student from the facilities that are consistent with their gender identity. (*Id.* at 12 ¶ 39). It just continues the message that the transgender student is different from the student's peers and should be segregated from them. (*Id.*). This contributes to feelings of isolation and low self-esteem that are common among transgender persons. *(Id.*). These experiences of shame and discrimination

have negative long-term consequences, creating a greater risk for posttraumatic stress disorder, depression, life dissatisfaction, anxiety, and suicidality when the student becomes an adult. (*Id*. at 12 ¶ 40).

II.    Procedural history

A.C. filed his Complaint for Declaratory and Injunctive Relief and Damages on December 3, 2021. (Dkt. 1 at 1). The complaint seeks injunctive relief requiring that A.C. be allowed access to boys' restrooms, requiring that A.C. be referred to by masculine pronouns and name, and requiring that he be allowed to play with the boys' soccer team this fall. (*Id.* at 10). On the same date A.C. filed his motion for preliminary injunction. (Dkt. 9 at 1). He did not seek a preliminary injunction concerning participation in boys' soccer (Dkt. 30 at 2 n.1), and as indicated previously, *supra* at 6, Martinsville has now determined that A.C. is to be referred to by male pronouns and by his male name. Therefore, the issue before the district court on the motion for preliminary injunction was whether A.C. should be allowed access to male restrooms.

On April 8, 2002, the district court heard oral argument on the preliminary injunction motion and it entered its Order on Plaintiff's Motion for Preliminary Injunction on April 29, 2022. (S.A. at A01). On May 19, 2022, the district court entered a stand-alone preliminary injunction. (*Id.* at A17).

In its Order granting A.C.'s motion for preliminary injunction, the district court found that A.C. established the required likelihood of success on the merits of his claims. (*Id.* at A10). The court held that *Whitaker* remains good law and was

binding on it. (*Id.* at A10-A11). The district court further noted that Martinsville's argument that it was allowed to maintain sex-separated restrooms ignored A.C.'s claim that he has the right to use the existing facilities that align with his gender identity. (*Id.* at A11). The district court found that although Martinsville had an unwritten policy allowing, on a case-by-case basis, some transgender students to use restrooms consistent with their gender identity, that policy was not made known to A.C. until after this case was filed, and there was no indication as to what additional steps by A.C. would be sufficient for him to be allowed access to the boys' restrooms. (*Id.*).

As to the other preliminary injunction factors, the district court found that A.C. was faced with irreparable harm for which there is no adequate remedy at law. "Like other courts recognizing the potential harm to transgender students, this Court finds no reason to question the credibility of A.C.'s account and that the negative emotional consequences with being refused accessed to the boys' restrooms constitute irreparable harm that would be difficult—if not impossible—to reverse." (*Id.* at A13) (internal quotation marks and citation omitted). The emotional harm A.C. identified cannot be rectified by damages. (*Id.* at A14).

The district court found that the balance of harms clearly favors A.C. as he presented evidence of the actual harm that he was suffering, as opposed to Martinsville's concern "with the privacy of other students [that] appears entirely conjectural. No evidence was provided to support the School District's concerns." (*Id.*). Moreover, Martinsville's articulated privacy interest was undermined by the fact that

[15]

other transgender students are allowed to use the restrooms associated with their gender identity with no evidence presented that this caused problems. (*Id.*).

Finally, the district court found the public interest would be served by vindicating A.C.'s statutory and constitutional rights and rejected the argument that allowing A.C. access to the boys' restrooms would threaten anyone's privacy interests. (*Id.* at A15).

The district court therefore granted the preliminary injunction and ordered that Martinsville "shall permit A.C. to use any boys' restroom within John R. Wooden Middle School. (*Id.*)

## Summary of the Argument

In *Whitaker,* this Court held that requiring a transgender student to use a restroom that does not conform to his gender identity is discrimination "on the basis of sex," which violates Title IX and which is subject to heightened equal protection scrutiny. 858 F.3d at 1049, 1051.

This case cannot be distinguished from *Whitaker*, and the district court properly concluded that A.C. is likely to prevail on his claim that denying him access to male restrooms violates Title IX.

*Whitaker* also compels the conclusion that the sex discrimination inflicted by Martinsville violates equal protection as Martinsville is unable to establish the required "exceedingly persuasive justification" to justify the discrimination. *United States v. Virginia*, 518 U.S. 515, 533 (1996). Martinsville's articulated concerns about

needing to protect student privacy are conjectural and are unsupported by the record. The record establishes that when A.C. was able to use male restrooms for a brief period there were no issues with other students. It further establishes that Martinsville allows other transgender high school students to use restrooms consistent with their gender identity without any problems. The identical privacy justification raised by Martinsville was rejected not only by *Whitaker*, but by other courts as well. The district court therefore properly concluded that A.C. was likely to succeed on the merits of his equal protection claim.

Because *Whitaker* is directly on point, Martinsville is left to argue that this Court should "revisit" *Whitaker*. (Appellants' Br. at 18). There are no grounds to do so. In *Bostock* the Supreme Court held that discrimination against persons because they are gay or transgender is sex discrimination under Title VII "because to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex." 140 S. Ct. at 1742. *Bostock* therefore supports this Court's conclusion in *Whitaker* that discrimination against a transgender student is sex discrimination. Martinsville argues that *Whitaker* itself violates Title IX because the statute and its regulations allow for sex-segregated facilities. But A.C. is not challenging the maintenance of sex-segregated restrooms as a general matter. He is challenging the fact that he is being excluded from the sex-segregated restrooms that correspond to his gender because he is transgender. Finally, the fact that *Whitaker* used what is now an incorrect standard to assess the

likelihood of success for a preliminary injunction in no way undermines this Court's legal conclusions regarding Title IX and equal protection.

Martinsville also argues that the district court erred in concluding that A.C. met the other factors for the grant of a preliminary injunction. However, A.C. is suffering irreparable harm for which there is no adequate remedy at law, not just because Martinsville is denying him rights guaranteed by equal protection and Title IX, but also from the undisputed fact that being denied access to the male restrooms has caused him physical pain and serious emotional distress. The district court also properly found that the balance of harms favors A.C. as the harms postulated by Martinsville are illusory. Finally, the public interest is served by supporting constitutional rights and the rights protected by Title IX.

## Argument

### I.    Standard of review

"When reviewing the grant of a preliminary injunction, [this Court] review[s] the district court's findings of fact for clear error and its legal conclusions *de novo*." *Common Cause Indiana v. Lawson*, 937 F.3d 944, 957 (7th Cir. 2019) (further citation omitted). The clear error standard applies to factual findings "even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). "A district court may abuse its discretion by making a clear factual error or a mistake of law. But [this Court] give[s] substantial deference to the court's

weighing of evidence and balancing of the various equitable factors." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015) (internal citations omitted).

II.   This Court held in *Whitaker* that denying a transgender student the ability to use restrooms consistent with his gender identity is discrimination on the basis of sex

Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Martinsville makes a lengthy argument that Title IX and its regulations give it the ability to exclude A.C. from male restrooms. However, absent from this argument is an explicit acknowledgement that this Court held in *Whitaker* that denying a transgender student the ability to use restrooms consistent with his gender identity—the precise discrimination meted out to A.C.—is discrimination on the basis of sex. Although Martinsville eventually segues into a non-meritorious argument, responded to below, that this Court should "revisit" *Whitaker*, it seeks to minimize the obvious: this case is on all fours with *Whitaker*.

In *Whitaker*, while affirming a preliminary injunction for a transgender male student who had been denied access to his high school's boys' restrooms, this Court determined that "[b]y definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth" and that "requir[ing] an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance,

which in turn violates Title IX." 858 F.3d at 1048-49.[3] From an equal protection standpoint, this is sex discrimination and "all gender-based classifications today warrant heightened scrutiny." *United States v. Virginia*, 518 U.S. 515, 555 (1996) (internal quotation and citation omitted). A defendant's justification for such discrimination must be "exceedingly persuasive," requiring the defendant to demonstrate that the "classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Whitaker*, 858 F.3d at 1050 (quoting *United States v. Virginia*, 518 U.S. at 524, 533 (cleaned up)).

In awarding A.C. a preliminary injunction, the district court correctly applied these legal standards both with regard to Title IX and equal protection.

III.  The district court properly found that A.C. is likely to prevail on the merits of his claim that denying him access to the male restrooms violates Title IX

To prevail on his Title IX claim, A.C. must demonstrate "(1) that he was excluded from participation in an education program 'on the basis of sex'; (2) that the educational institution was receiving federal financial assistance at the time; and (3) that improper discrimination caused him harm." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *cert. denied*, –U.S.–, 141 S. Ct. 2878 (2021). It is undisputed that Martinsville is a recipient of federal financial assistance (*supra* at 3) and restrooms are part of Martinsville's education program, *see, e.g., Grimm*, 972

---

[3]    In *Whitaker,* the Court noted that numerous courts had recognized that transgender plaintiffs could bring discrimination claims based on the sex-stereotyping theory recognized in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). *Whitaker*, 858 F.3d at 1048-49 (citing cases).

F.3d at 626.

The legal question of whether Martinsville's exclusion of A.C. from the boys' restrooms solely because he is transgender constitutes prohibited sex discrimination under Title IX was answered by this Court in *Whitaker*. Like the plaintiff in that case, A.C. is a transgender male who has a lengthy and consistent history of identifying as male; who is diagnosed with gender dysphoria; who is in therapy; who has publicly transitioned; who used the boys' restrooms in school without incident until he ceased doing so when threatened with discipline; who is experiencing significant distress, depression, and anxiety because of not being able to use male restrooms; and who tries not to use the school restrooms at all, despite the fact that this causes him physical distress. *Compare Whitaker*, 858 F.3d 1040-41, *with supra* at 3-10.

It is uncontested that because of not being able to use the boys' restrooms, A.C. will sometimes avoid using the bathroom at school, and while this causes him physical discomfort, he believes that doing so is better than being made to feel different and singled out by being required to use the distant clinic restroom. (*Supra* at 7). Of course, the harm that can be demonstrated to prove a Title IX violation is not restricted to physical harm but includes "emotional and dignitary harm." *Grimm*, 972 F.3d at 618. And it is not disputed that being recognized as the boy he is at school is critical to A.C.'s overall well-being. (*Supra* at 13). A.C.'s exclusion from the boys' restrooms exacerbates his gender dysphoria, increasing his anxiety and depression. (*Supra* at 7, 10). These harms will continue unabated, making him feel like an outcast at school because of who he is, until Martinsville treats A.C. like all other boys. (*Supra*

[21]

at 7, 10). For these reasons, the use of the distant health office, where A.C. has to sign in to use the restroom and where he is singled out as different from his classmates, is not an adequate substitute. (*Supra* at 7). This is no different than *Whitaker,* where this Court noted that the fact that the plaintiff was allowed to use a gender-neutral restroom in the school's office was not a true alternative to restrooms consistent with his identity given the distance from his classes and the increased stigmatization that the alternative caused him. *Whitaker*, 858 F.3d at 1050.

The nature of A.C.'s harm is demonstrated by the fact that for the brief period of time that A.C. used the male restrooms, without incident, he became more comfortable at school and felt better about himself as he was able to live as a boy. (*Supra* at 8). As Dr. Fortenberry noted, being denied the ability to use the restroom associated with one's gender identity "is an ever-present source of distress and anxiety" for a transgender person and was noted as a source of distress for A.C. (Fortenberry Dec. Dkt. 29-1 at 11 ¶ 37; M.C. Dec. Dkt. 29-2 at 9). Being denied the ability to use male restrooms caused and, if the injunction is lifted, will again cause A.C. harm.

It is true that because of his age, A.C. has yet to begin receiving hormones, although he intends to receive them when they become medically available to him. (*Supra* at 5). However, he is on hormone-suppressing medications, which suppress his menstrual cycle, and is typically male in appearance, treated as male by his family, and is known as a boy. (*Supra* at 3-4) It is also true that Ash Whitaker was in high school and A.C. is in middle school. These differences do not affect *Whitaker*'s

applicability—the meaning of "discrimination on the basis of sex" under Title IX does not turn on an individual's age.[4] Like the student in *Whitaker*, "[t]his is not a case where a student has merely announced that he is a different gender. Rather, [A.C.] has a medically diagnosed and documented condition." *Whitaker*, 858 F.3d at 1050.

This Court need go no further than *Whitaker* to conclude that A.C. has a probability of success in demonstrating that he has been subjected to discrimination on the basis of sex. However, *Whitaker* is not alone. The Fourth Circuit in *Grimm* concluded that a transgender student who was denied access to male restrooms demonstrated a violation of Title IX. 972 F.3d at 619.[5] In *Doe ex rel. Doe v. Boyertown*

---

[4]     Martinsville notes repeatedly that A.C. was denied a gender-marker change by an Indiana state court. (*See, e.g.,* Appellants' Br. at 30). The relevance of this is not clear as Martinsville's entire argument, made in the face of *Whitaker*, is that because A.C. was assigned the sex of female at birth, he may be barred from male restrooms. Obviously, a gender-marker change will not alter his genitalia. Moreover, the state court denying his gender-marker change request noted that it did not know if it had the authority to issue such an order (Dkt. 43-1 ¶ 6), a concern ratified by recent case law in Indiana. *See In re: the Change of Gender of: O.J.G.S., A Minor,* 187 N.E.3d 324, 330 (Ind. Ct. App. 2022) (finding no statutory authority for courts to order a change of a minor's gender marker on a birth certificate and disagreeing with a prior appellate decision involving some of the same litigants that held to the contrary, *see In re Change of Gender Identification of A.B.,* 164 N.E.3d 167, 170-71 (Ind. Ct. App. 2021)). Since the filing of this appeal a different Indiana trial court has entered an order changing A.C.'s gender marker on his birth certificate to "male." A redacted copy of this order has been filed in appellee's supplemental appendix and an unredacted copy has been filed on this date accompanied by a motion to seal. Appellee requests that this Court take judicial notice of this order. *See. e.g., Spiegel v. Kim,* 952 F.3d 844, 847 (7th Cir. 2020) ("A court may take judicial notice of public records such as the state court documents.")*, cert denied,* –U.S.–, 141 S. Ct. 369 (2020).

        In the district court Martinsville argued that the decision of the state court on the gender marker issue was entitled to collateral estoppel effect. (Dkt. 42). The district court properly rejected the request, noting that the issue of a gender marker change was not the issue presented by this case. (Dkt. 47 at 2). After all, Ash Whitaker also could not obtain a gender-marker change. *Whitaker*, 858 F.3d at 1053. Although Martinsville mentions its request (Appellants' Br. at 6), it does not renew its collateral estoppel argument in this Court or otherwise challenge the district court's decision in this regard.

[5]     The court noted, in language apposite to this case that:

*Area School District*, 897 F.3d 518 (3d Cir. 2018), the court rejected a claim by cisgender students that a policy allowing transgender students to access bathrooms consistent with their gender identity violated the cisgender students' rights under Title IX by noting that "requiring transgender students to use single user or birth-sex-aligned facilities is its own form of discrimination." *Id.* at 530. And, in *Dodds v. United States Department of Education*, 845 F.3d 217 (6th Cir. 2016), the court, in refusing to grant a school district a stay of a preliminary injunction pending appeal that ordered the district to allow an eleven-year-old transgender girl to use female restrooms noted that the school district could not establish the likelihood that it would succeed on appeal given that sex-stereotyping was impermissible discrimination. *Id.* at 221. *See also Parents for Privacy v. Dallas Sch. Dist.*, 326 F. Supp. 3d 1075, 1106 (D. Or. 2018) (rejecting a challenge by cisgender students to a policy allowing transgender students to use facilities consistent with gender identity and stating that "[f]orcing transgender students to use facilities inconsistent with their gender identity would undoubtedly harm those students and prevent them from

---

Grimm has consistently and persistently identified as male. He had been clinically diagnosed with gender dysphoria, and his treatment provider identified using the boys restrooms as part of the appropriate treatment. Rather than contend with Grimm's serious medical need, the Board relied on its own invented classification, "biological gender," for which it turned to the sex on his birth certificate. And even when Grimm provided the school with his amended birth certificate, the Board *still* denied him access to the boys restrooms.

For these reasons, we hold that the Board's application of its restroom policy against Grimm violated Title IX.

972 F.3d at 619 (emphasis by the court) (footnote omitted).

equally accessing educational opportunities and resources" and would violate Title IX), *aff'd*, 949 F.3d 1210 (9th Cir. 2020), *cert. denied*, –U.S.–, 141 S. Ct. 894 (2020); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 717 (D. Md. 2018) (denying a motion to dismiss and finding that refusing a transgender student access to the locker room consistent with his gender identity stated a Title IX claim).

A.C. is likely to prevail on his Title IX claim.

IV.    A.C. is likely to prevail on his equal protection claim

A.    Martinsville's exclusion of A.C. from the boys' restrooms is sex discrimination, triggering heightened scrutiny

By excluding A.C. from the boys' restrooms solely because he is transgender, Martinsville has discriminated against him on the basis of his sex in violation of the Equal Protection Clause. This Court has already held in *Whitaker* that where a "School District's policy cannot be stated without referencing sex," then the policy creates a sex-based classification for purposes of equal protection. 858 F.3d at 1051. This, of course, echoes the analysis already described in the context of Title IX. And the holding of *Whitaker* in this regard is not unique. *See also Grimm*, 972 F.3d at 607 (applying heightened scrutiny as "the bathroom policy rests on sex-based classifications"); *M.A.B.*, 286 F. Supp. 3d at 718-19 (subjecting a ban of a transgender male student from male locker rooms to intermediate scrutiny as it represents sex-based discrimination).[6] Here, Martinsville's position that A.C. cannot use the boys'

---

[6]    The court in *Adams v. School Board of St. Johns Co., Fla.*, 3 F.4th 1299 (4th Cir. 2021), *vacated and en banc rehearing granted,* 9 F.4th 1369 (4th Cir. 2021), also concluded that a school policy that prevented a male transgender student from using male restrooms was subject to intermediate scrutiny as a gender-based classification. *Id.* at 1307-08. As noted,

restroom because of his "biological sex" this is a sex-based classification.

All sex-based classifications are subject to "demanding" scrutiny, requiring Martinsville to demonstrate "an exceedingly persuasive justification" for its differential treatment. *United States v. Virginia*, 518 U.S. at 533. Under heightened scrutiny, Martinsville carries the burden of demonstrating that the classification "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* at 524. "It is not sufficient to provide a hypothesized or *post hoc* justification created in response to litigation. Nor may the justification be based upon overbroad generalizations about sex. Instead, the justification must be genuine." *Whitaker*, 858 F.3d at 1050 (internal citations omitted).

B.    Excluding A.C. from the boys' restrooms is not substantially related to an important governmental objective

Martinsville argues that its policy is justified by its "important objectives of protecting the interest of students in using the restroom away from the opposite sex and in shielding their bodies from exposure to the opposite sex." (Appellants' Br. at 16). But this Court has already rejected that precise argument in *Whitaker*.

The record undermines Martinsville's claim that excluding A.C. from boys' restrooms is necessary to protect the privacy interests of non-transgender students. It is uncontested that when A.C. used the male bathrooms for three weeks, he did so without any negative reaction from students and there is absolutely no evidence that

_____

the decision has been vacated and the Fourth Circuit is conducting en banc review of the case.

any unwanted privacy violations occur in the restroom generally or occurred during that time. (*Supra* at 8). It is incumbent on Martinsville to present evidence and not to rest upon "hypothesized or *post hoc* justification[s]." *Whitaker*, 858 F.3d at 1050. Martinsville presents only hypothesized harm.

The fact that Martinsville can produce no evidence to support its hypothesized harm is not surprising. For it is uncontested that Martinsville does allow some transgender students in its high school to use restrooms that are consistent with their gender identity. (*Supra* at 9). Martinsville does not adequately explain why the privacy concerns that it articulates are greater in middle school than in high school. The fact that it can cite no examples of privacy concerns from the experiences of high school students certainly demonstrates that the absence of any privacy concerns in the middle school is neither surprising nor an aberration.

The articulated privacy concerns are also without legitimacy. As this Court noted in *Whitaker*, in language that bears repeating at length,

> [a] transgender student's presence in the restroom provides no more of a risk to other students' privacy rights than the presence of an overly curious student of the same biological sex who decides to sneak glances at his or her classmates performing their bodily functions. Or for that matter, any other student who uses the bathroom at the same time. Common sense tells us that the communal restroom is a place where individuals act in a discreet manner to protect their privacy and those who have true privacy concerns are able to utilize a stall. Nothing in the record suggests that the bathrooms at [the] High School are particularly susceptible to an intrusion upon an individual's privacy. Further, if the School District's concern is that a child will be in the bathroom with another child who does not look anatomically the same, then it would seem that separate bathrooms also would be appropriate for pre-pubescent and post-pubescent children who do not look alike anatomically. But the School District has not drawn this line. Therefore, this court agrees with the district court that the School District's privacy

arguments are insufficient to establish an exceedingly persuasive justification for the classification.

858 F.3d at 1052-53.[7] The Fourth Circuit in *Grimm* likewise emphasized that the privacy arguments typically raised in this context fall flat, highlighting that many school districts across the country successfully allow transgender students to use restrooms matching their gender identity, without incident, and concluding that the school's concerns were merely conjectural. 972 F.3d at 614. And the court ultimately concluded that the school's policy, to the extent that it was based upon privacy concerns, was "marked by misconception and prejudice." *Id.* at 615.

Courts have also evaluated these privacy concerns in the context of lawsuits raised by non-transgender students seeking to prohibit transgender students from using the restrooms associated with their gender identity. Other circuits have rejected such privacy-related challenges. In *Boyertown,* the court concluded that any impingement on cisgender students' privacy rights was outweighed by the harm caused to transgender students by not being able to use restrooms and locker rooms consistent with their gender identity, and "the presence of transgender students in these spaces does not offend the constitutional right of privacy any more than the presence of cisgender students in those spaces." 897 F.3d. at 533. *See also Parents for Privacy,* 949 F.3d 1210, 1225 (9th Cir. 2020), *cert. denied,* –U.S–, 141 S. Ct. 894 (2020) (cisgender students do not have a constitutional privacy right to not share restrooms

---

[7]     The fact that persons using restrooms, regardless of gender identity, tend to be discreet, distinguishes the school's bathrooms from situations, cited by Martinsville, where persons are unknowingly videotaped and whose privacy has been invaded even when they may have diligently attempted to protect it. (*See* Appellants' Br. at 13-14, 16).

or locker rooms with transgender students).

Of course, if cisgender students are somehow offended by A.C.'s presence in a closed bathroom stall in a boys' restroom, these students should be allowed to use the restroom in the health office. This easy solution undercuts any justification that Martinsville can offer for denying A.C. the ability to use the male restrooms. *See, e.g.*, *Boyertown*, 897 F.3d at 530 ("cisgender students who feel that they must try to limit trips to the restroom to avoid contact with transgender students can use the single-user bathrooms in the school"); *Parents for Privacy*, 949 F.3d at 1225 (noting that the school has "alternative options and privacy protections to those who do not want to share facilities with a transgender student"); *M.A.B.*, 286 F. Supp. 3d at 724 (the alternatives that can be provided to cisgender students means that banning transgender students from locker rooms consistent with their gender identity is not substantially related to the asserted privacy interests). This easy solution to the illusory and conjectural concerns of Martinsville further demonstrates that denying A.C. the ability to use the boys' restrooms is not related to any legitimate privacy interest.[8]

---

[8]     In addition to arguing that Martinsville had engaged in sex discrimination, A.C. also argued in the district court that his ban from restrooms is subject to elevated scrutiny because it represented discrimination against transgender persons who must be deemed to be a quasi-suspect class. (Dkt. 30 at 26 n.11; Dkt. 39 at 16-17). The district court did not reach this issue and this Court need not do so either. However, as noted by numerous courts, discrimination against transgender persons is subject to this elevated scrutiny. *See, e.g., Grimm,* 972 F.3d at 613; *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019); *Ray v. McCloud,* 507 F. Supp. 3d 925, 937 (S.D. Ohio 2020); *M.A.B. v. Bd. of Ed. of Talbot Co.*, 286 F. Supp. 3d 704, 719-21 (D. Md. 2018); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018); *Evancho v. Pine-Richland School Dist.*, 237 F. Supp. 3d 267, 289 (W.D. Pa. 2017); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015). Transgender persons certainly meet the four-part test set out in *Windsor v. United States*, 699 F.3d 169 (2d Cir.

V.     There are no grounds to revisit *Whitaker*

Faced with *Whitaker*, a decision that is indistinguishable from this case, Martinsville is left to argue that this Court should "revisit" that case. This Court has shown a marked reluctance to overturn its prior decisions, particularly when the decision is not an outlier and even if there is a split in the circuits. *See, e.g.*, *Buchmeier v. United States*, 581 F.3d 561, 565-66 (7th Cir. 2009) (en banc). Here, *Whitaker* is certainly not an outlier, and the decision is supported by intervening Supreme Court precedent. There is no reason to reconsider the decision.

A.     This Court's conclusions in *Whitaker* concerning Title IX are supported by the Supreme Court's decision in *Bostock*

Martinsville seeks support in *Bostock* for its argument that *Whitaker* should be reexamined. (Appellants' Br. at 22). Far from weakening this Court's conclusion

---

2012), *aff'd on other grounds*, 570 U.S. 744 (2013), to determine whether a quasi-suspect class is present:

> A) whether the class has been historically subjected to discrimination; B) whether the class has a defining characteristic that frequently bears a relation to ability to perform or contribute to society; C) whether the class exhibits obvious, immutable or distinguishing characteristics that define them as a discrete group; and D) whether the class is a minority or politically powerless.

*Id.* at 181. Although this Court in *Whitaker* did not reach the issue, it did point out the "discrimination, harassment, and violence" faced by transgender persons, which it termed "alarming." 858 F.3d at 1051. And it cannot be argued that that a person's transgender status has any bearing on their ability to contribute to society. It is uncontested that one's gender identity is not a choice. (Dkt. 29-1 ¶ 17). Transgender persons comprise just a tiny fraction of the population, only 0.6%, (*id.* ¶ 16) and obviously lack political power. Therefore, it would be appropriate to analyze A.C.'s equal protection claim as discrimination against a member of a quasi-suspect class. However, inasmuch as this results in the same scrutiny and result as A.C.'s sex-discrimination claim, there is no need to pursue this matter further at this time, although A.C. reserves the right to pursue it further in the district court.

in *Whitaker* concerning Title IX, *Bostock* supports it. There is certainly no basis to disturb this controlling precedent.

In *Bostock,* the Supreme Court considered challenges raised under Title VII by individuals who had been subjected to adverse employment actions because of their sexual orientation or transgender status. 140 S. Ct. at 1737-38. The Court unequivocally concluded that sexual orientation and transgender status

> are inextricably bound up with sex. Not because homosexuality or transgender status are related to sex in some vague sense or because discrimination on these bases has some disparate impact on one sex or another, but because to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex.

*Id.* at 1742. The Court stressed that "[f]or an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex. That has always been prohibited by Title VII's plain terms—and that should be the end of the analysis." *Id.* at 1743 (internal quotation and citation omitted).

It is, of course, true that the Court in *Bostock* did not address the propriety of denying transgender persons access to restrooms conforming to their gender identity under either Title VII or Title IX, 140 S. Ct. at 1753, as that question was not before it. This is not an invitation to revisit the binding precedent of *Whitaker*. The Court certainly did not reject a sex-stereotyping approach to assessing discrimination against transgender persons as it acknowledged that discriminating against someone because they are transgender or gay is no more lawful than discriminating based on sex stereotypes. *Id.* at 1742-43, 1749. In any event, the Supreme Court's reasoning in

[31]

*Bostock* cannot be construed as even questioning *Whitaker* where the exact same conclusion was reached, regardless of the theory utilized: discrimination against transgender persons is discrimination on the basis of sex.

Martinsville's argument that *Bostock* cannot be applied outside of the Title VII context is wholly inconsistent with prevailing law. Courts have recognized that "[i]t would be logically inconsistent with *Bostock* to find that Title IX permits discrimination for being transgender." *C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*, 536 F. Supp. 3d 791, 796 (W.D. Wash. 2021). In *Grimm*, the court concluded that denying a transgender student the ability to use restrooms consistent with his gender identity violated both Title IX and equal protection. 972 F.3d at 616, 619. In doing so, the court recognized that *Bostock* supported its holding that the plaintiff had been discriminated against "on the basis of sex" as *Bostock* found that "the discriminator is necessarily referring to the individual's sex to determine incongruence between sex and gender, making sex a but-for cause for the discriminator's actions." *Id.* at 616 (citing *Bostock*, 140 S. Ct. at 1741-42). In *Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022), the Ninth Circuit rejected a district court's attempt to limit *Bostock*'s reasoning to Title VII: "Given the similarity in language prohibiting sex discrimination in Titles VII and IX, we do not think *Bostock* can be limited in the manner the district court suggested." *Id.* at 114.

Martinsville's argument simply is that "sex" means one thing under Title VII but something different under Title IX. It offers no explanation for why this would be, and it ignores the fact that courts have routinely "used precedent interpreting the

antidiscrimination provisions of Title VII in [their] analysis of comparable provisions in Title IX." *Peltier v. Charter Day Sch., Inc.*, 37 F. 4th 104, 130 n.22 (4th Cir. 2022) (en banc) (citing cases); *see also, e.g.*, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 n.1 (1999) (Thomas, J., dissenting) ("This Court has also looked to its Title VII interpretations of discrimination in illuminating Title IX.") (citing *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992)); *Whitaker*, 858 F.3d at 1047 ("this court has looked to Title VII when construing Title IX" (citation omitted)); *Nelson v. Christian Bros. Univ.*, 226 Fed. App'x 448, 454 (6th Cir. 2007) ("Generally, courts have looked to Title VII as an analog for the legal standards in both Title IX discrimination and retaliation claims.") (internal citation and further citations omitted); *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 896 (1st Cir. 1988) ("[W]e can draw upon the substantial body of case law developed under Title VII to assess the plaintiff's claims under both section 1983 (the equal protection clause) and Title IX.") (footnote omitted).

The Supreme Court has commented that "if we are to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language." *North Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 521 (1982) (quoting *United States v. Price*, 383 U.S. 787, 801 (1966) (addition by the Court)). *Bostock* does nothing to minimize the broad sweep of Title IX and bolsters this Court's conclusion in *Whitaker* that denying Ash Whitaker access to male restrooms was discrimination "on the basis of sex."

B.    *Whitaker* does not contravene what Title IX allows

Martinsville engages in a lengthy analysis as to why Title IX and 34 C.F.R.

[33]

§ 106.33 allow it to deny A.C. the ability to use male restrooms, but nothing about the statutory text of Title IX or its implementing regulations have changed since this Court's decision in *Whitaker*. Martinsville is asking this Court to ignore *Whitaker* and reanalyze the very same text and regulations to reach a different outcome. Even if this Court were to re-review the statutory text and regulations, such an analysis leads inexorably to the conclusion that Martinsville violated A.C.'s statutory and constitutional rights by discriminating against him on the basis of sex.

To be sure, 34 C.F.R. § 106.33 allows schools to "provide separate toilet, locker room, and shower facilities on the basis of sex." But A.C. is not challenging the existence of separate facilities, he is simply seeking access to them. The entirety of Martinsville's argument is based on its claim that the word "sex" in Title IX is defined as the sex that a person is assigned at birth based on their genitalia. This completely ignores the fact that while this Court acknowledged 34 C.F.R. § 106.33 in *Whitaker*, it further noted that "[n]either the statute nor the regulations define the term 'sex.' Also absent from the statute is the term 'biological,' which the School District maintains is a necessary modifier." *Whitaker*, 858 F.3d at 1047.[9] While Martinsville

---

[9]     In an attempt to bolster its argument concerning the meaning of "sex," Martinsville cites to what is asserts is Dr. Fortenberry's distinction between "sex" and "gender." (Appellant Br. at 2 n.2). The meaning of the term "sex" is a legal question for this Court, not a witness, to determine. *See, e.g., Mid-Con Freight Systems, Inc. v. Mich. Pub. Serv. Comm'n*, 545 U.S. 440, 446 (2005) (noting that interpretation of words in the statute are a "legal question"). Moreover, it is clear that Dr. Fortenberry had a much more nuanced view.

> Q.     So I guess what I am referring to as a biological male is someone who was born with a penis.
>
> A.     Being born with a penis does not equal being male. A penis is a penis associated with a particular genetic inheritance. A vulva is a vulva, without a sex associated with it, associated with a particular genetic inheritance.

does not acknowledge it, both *Whitaker* and *Bostock* recognize that discrimination

against transgender persons is discrimination on the basis of sex.[10]

In *Grimm,* the school district made precisely the same argument, contending

that Title IX, and particularly 34 C.F.R. § 106.33, authorized it to exclude a

transgender male student from male restrooms. 972 F.3d at 618. The court's rejection

of this argument is cited at length, as it also directly refutes Martinsville's argument.

> But Grimm does not challenge sex-separated restrooms; he challenges
> the Board's discriminatory exclusion of himself from the sex-separated
> restroom matching his gender identity. . . And the implementing

---

(Dkt. 38-1 at 9:23 - 10:5). Dr, Fortenberry further noted that gender transition allows the transgender person to "live as a member of the sex of their gender identity." (Dkt. 29-1 ¶ 8). No one disputes that A.C. was assigned the sex of female at birth based on his genitalia. However, as *Whitaker* and *Bostock* demonstrate, that does not answer the question of whether he is being discriminated against "on the basis of sex."

[10]     Martinsville's argument is further undercut by the fact that its erroneously narrow view of the meaning of "sex" is not shared by the United States Department of Justice, which has announce proposed amendments to Title IX regulations. *See,* Proposed Rule, *Nondiscrimination on the Basis of Sex in Education Programs of Activities Receiving Federal Financial Assistance*, 87 FR 41390-01, 2022 WL 266876(F.R.) (July 12, 2022). These specifically provide that Title IX prohibits discrimination based on sex stereotypes, sexual orientation and gender identity and further provide that:

> [i]n the limited circumstances in which Title IX or this part permits different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, unless otherwise permitted by Title IX or this part. Adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex.

*Id.* at 87 FR 41571 (proposed 34 C.F.R. § 106.10; 34 C.F.R § 106.31(a)(2)). This was preceded by an Executive Order dated January 20, 2021, where President Bident noted that "[u]nder Bostock's reasoning, laws that prohibit sex discrimination[,] including Title IX of the Education Amendments of 1972 . . .[,] prohibit discrimination on the basis of gender identity or sexual orientation, so long as the laws do not contain sufficient indications to the contrary." Exec. Order No. 13988. 86 FR 7023, 2021 WL 229396 (Jan. 20, 2021).

regulation cannot override the statutory prohibition against *discrimination* on the basis of sex. All it suggests is that the act of creating sex-separated restrooms in and of itself is not discriminatory— not that, in applying bathroom policies to students like Grimm, the Board may rely in its own discriminatory notions of what "sex" means.

*Id.* (emphasis by the court) (footnote omitted). As the district court noted in this case, "A.C.'s claims are based on the School District's treatment of him as an individual. . . . [H]e is seeking to use those facilities that already exist and align with his gender identity; his claim is solely that the School District is forbidding him from doing so." (S.A. at A11). And, as noted, numerous other cases agree that discrimination similar to that engaged in by Martinsville violates Title IX. (*Supra* at 23-25).

Martinsville's attempt to justify its discrimination by citing to 20 U.S.C. § 1686's language authorizing separate living facilities for "the different sexes" is similarly unavailing. That statutory language does not provide an exception to Title IX's overarching prohibition on discrimination based on sex. It, like the restroom regulation, "is a broad statement that sex-separated living facilities are not unlawful—not that schools may act in an arbitrary or discriminatory manner when dividing students into those sex-separated facilities." *Grimm*, 972 F.3d at 618 n.16.

While Martinsville attempts to stress what it terms are the "physical differences between the sexes" and the privacy issues surrounding bathroom use (Appellants' Br. at 12-14), this is merely an attempt to ignore *Whitaker* and *Bostock*. The point is that if a transgender boy were a cisgender boy, he could use the male restrooms. But the transgender boy is denied solely because he is transgender. "[I]t is impossible to discriminate against a person for being . . . transgender without

discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741. Title IX most assuredly does not authorize the discrimination that has been imposed on A.C.

### C. *Whitaker* is not undermined by the fact that it articulated the incorrect preliminary injunction standard

In *Whitaker,* this Court stated that that in order to demonstrate a likelihood of success on the merits in a preliminary injunction, the plaintiff need only establish that the chances to succeed are "better than negligible." 858 F.3d at 1046. Since then, this Court has recognized that this is not the proper standard. *See Pritzker*, 973 F.3d at 763 (noting that the "better than negligible" standard has been "retired by the Supreme Court"). The fact that *Whitaker* has been abrogated to the extent that it used what has since been declared to be an erroneous preliminary injunction standard does not affect this Court's legal conclusions that denying a transgender student the ability to use the restrooms that are consistent with his gender identity is discrimination "on the basis of sex." A court's interpretation of the substantive law remains the same whether a plaintiff seeks a preliminary or permanent injunction, regardless of whether the now-defunct "better than negligible" standard was articulated. And authority remains authoritative even if it has been abrogated on a limited point unrelated to the principle for which it is being cited. *See, e.g.*, *Ybarra v. City of Chicago*, 946 F.3d 975, 983 (7th Cir. 2020) (Hamilton, J., concurring) (citing Supreme Court precedent that had been "abrogated in nonrelevant part" by a subsequent Supreme Court case); *Dhakal v. Sessions*, 895 F.3d 532, 539 (7th Cir. 2018) (citing as authority a Supreme Court case that had been "abrogated in part on

other grounds" by a later case); *Skiba v. Ill. Cent. R.R.*, 884 F.3d 708, 720 (7th Cir. 2018) (citing a Seventh Circuit case that had been "overruled on other grounds").

To put it simply, this Court in *Whitaker* did not determine that the plaintiff had a "better than negligible" chance of establishing what the law was: this Court stated the law. It then concluded that Ash Whitaker had a "better than negligible" chance of establishing that the school district's actions violated it. The fact that this Court used the incorrect standard for assessing whether Ash Whitaker was entitled to relief does not alter its holding that as a matter of law, denying a transgender student the ability to use the restroom associated with his gender identity is sex discrimination. And it is this essential holding that Martinsville ignores.[11]

---

[11]     Other courts continue to cite *Whitaker*'s holding concerning the meaning of discriminating against a person "on the basis of sex." *See, e.g., Grimm*, 976 F. 3d at 401 (Wynn, J., concurring in denial of rehearing en banc) (citing *Whitaker,* and other cases, to support the fact that the panel's decision that the School Board denied both Title IX and equal protection when it prevented a transgender male student from using the boys' restroom was correct; *Boston Alliance of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health & Human Servs.,* 557 F. Supp. 3d 224, 244 (D. Mass. 2021) (citing *Whitaker,* and other cases, after stating that "while the First Circuit has not spoken on the subject, other circuits have held that intermediate scrutiny applies to discrimination based on transgender status in the equal protection context"); *D.T. v. Christ*, 552 F. Supp. 3d 888, 896 (D. Az. 2021) (citing *Whitaker* as one of a number of cases holding that "[d]iscrimination against transgender people is discrimination based on sex; as such, heightened scrutiny applies"); *Soule ex rel. Stanescu v. Conn. Ass'n of Schools, Inc.*, 2021 WL 1617206, at *10 (D. Conn. Apr. 25, 2021) (citing *Whitaker* after stating "[c]ourts across the country have consistently held that Title IX requires schools to treat transgender students consistent with their gender identity. . . . Every Court of Appeals to consider the issue has so held."); *Brickhouse v. Lashbrook*, 2020 WL 7059256, at *3 (S.D. Ill. Dec. 2, 2020) (citing *Whitaker* for the proposition that "discrimination based on a person's transgender status or discrimination based on sex stereotyping may also be actionable as an equal protection claim"); *Hobby Lobby Stores, Inc. v. Sommerville*, 186 N.E.3d 67, 83 (Ill. Ct. App. 2021) (citing *Whitaker* as one of many cases "upholding the right of transgender persons to be free from discrimination in employment and in access to bathrooms matching their gender identity), *appeal allowed*, 183 N.E.3d 880 (Ill. 2021); *Love v. Young*, 320 So. 3d 259, 274 n.17 (Fla. Ct. App. 2021) (noting that "[i]n *Whitaker*, the court allowed a claim for discrimination on the basis of sex under Title IX"); *N.H. v. Anoka-Hennepin Sch. Dist. No. 11*, 950 N.W.2d 553, 563 (N.H. Ct. App. 2020) (citing

VI.    The district court properly concluded that the other requirements for the grant of a preliminary injunction are met

    A.    A.C. is suffering irreparable harm for which there is no adequate remedy at law

The denial of A.C.'s constitutional and statutory rights is, in and of itself, irreparable harm. "Courts have . . . held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). The same is true concerning denial of rights secured by Title IX. *See, e.g., Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 973 (D. Minn. 2016) ("Plaintiffs' expectation that they may be treated unequally in violation of Title IX's terms is an irreparable harm.").

Moreover, Martinsville is ignoring the uncontested evidence demonstrating the myriad harms to A.C., all of which independently, and collectively, constitute irreparable harm. For example, there are times that A.C. will not use the restroom for the entire day, choosing the physical discomfort that this caused over the emotional pain of being singled out as being required to use the distant clinic restroom. (*Supra* at 7). Martinsville does not contest that as A.C. has gotten older "it has become increasingly distressing for him to be viewed by others as a girl and to

---

*Whitaker* as one of "the overwhelming majority of federal courts that have recently examined transgender education-discrimination claims under Title IX [and] have concluded that preventing a transgender student from using a school restroom or locker room consistent with the student's gender identity violates Title IX").

have a body that does not align with his gender. This distress has manifested itself in multiple ways, including depression, anxiety, anger, and self-harm." (M.C. Dec. Dkt. 29-2 at 2 ¶ 12).

Martinsville does not dispute that A.C. suffers from gender dysphoria and that, as he noted, not being allowed to use the male restrooms

> undermines my transition and worsens the anxiety and depression caused by my gender dysphoria. It makes me feel isolated and punished for being who I am. It also tells other students that I am different and should not be treated like other boys. It makes being at school painful. I like school because I love learning but there are days I just cannot go because it feels too awful to have people not see me as the boy that I am.

(A.C. Dec. Dkt. 29-3 at 5 ¶ 27). A.C. further notes that

> I also don't like using the clinic restroom because using it singles me out and doesn't let me be myself at school. Because of how bad using the clinic restroom makes me feel, sometimes I avoid using the bathroom at all during the day. Even though this causes me physical discomfort, it is better than being singled out as different.

(*Id.* at 4 ¶ 22).

Dr. Fortenberry confirms that A.C. has identified bathroom usage at school as a significant source of "distress, depression, and anxiety" and that use of restrooms "consistent with [ ] experienced gender and gender identity is a standard element of our clinical protocols in terms of its relevance to each patient's health and safety." (M.C. Dec. Dkt. 29-2 at 9). As Dr. Fortenberry notes in more detail

> [t]he ability to be able to use toilet facilities consistent with one's experienced and expressed gender is a prime component of gender affirmation. Being denied the use of gendered toilet facilities consistent with expressed gender is experienced as an ever-present source of distress and anxiety. Distress and anxiety are linked to increases in self-harming behaviors including suicidality.

\*                    \*                    \*

It is well-established by research and clinical experience that these experiences of shame and discrimination have long-term negative influences on mental health, physical health, and overall wellbeing.

(Fortenberry Dec. Dkt. 29-1 at 11-12 ¶¶ 37, 40).

A.C.'s mother also confirmed that not being able to use the boys' restrooms causes A.C. anxiety and depression, while being able to use the boys' restrooms, for even a brief time, made him happier and feel less stigmatized. (*Supra* at 8). Martinsville offers no evidence to counter this.

Of course, irreparable harm and a lack of an adequate remedy at law can be demonstrated without A.C. being actively suicidal. In granting a preliminary injunction to transgender students who had been prohibited from using restrooms of their identified gender, the *Evancho* court noted "it  is not a long leap, nor really a leap at all, to give credence to the Plaintiffs' assertions that they subjectively feel marginalized, and objectively are marginalized, which is causing them genuine distress, anxiety, discomfort and humiliation."  237 F. Supp. 3d at 294.

Irreparable harm is "defined as harm that cannot be repaired and for which money compensation is inadequate." *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (internal quotation and citation omitted). The uncontested evidence demonstrates that without an injunction A.C. will suffer irreparable harm.

B.     The balance of harms favors A.C.

Martinsville argues that it will be harmed by the preliminary injunction inasmuch as it will no longer be able to rely on Title IX regulations and "will be forced

to navigate this new frontier without the benefit of established rules," and the privacy rights of other students will be violated. (Appellants' Br. at 31). But this argument is tied to Martinsville's erroneous suggestion that allowing A.C. to use the boys' restrooms would lead to the collapse of all sex-separated spaces. Not so. The injunction merely forces Martinsville to conform its conduct to the requirements of the Constitution and federal law—a requirement that Martinsville cannot claim is harmful. *See, e.g.*, *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) (holding that if a governmental entity "is applying [a] policy in a manner that violates [the plaintiff's] First Amendment rights…then [the] claimed harm is no harm at all").

It is not clear of what Martinsville complains as it does not explain the contours of this apparently perilous "new frontier." A.C. is a boy and seeks to use the boys' restrooms. This is not some new area. It is what is required by federal law and the Constitution.[12] And, as noted above, there simply is no evidence that allowing A.C. to use male restrooms is negatively impacting the privacy of other students. Martinsville's "concerns with the privacy of other students appears entirely conjectural. No evidence was provided to support the School District's concerns, and other courts dealing with similar defenses have also dismissed them as unfounded." (S.A. at A14). Moreover, Martinsville's "concerns over privacy are undermined given that it has already granted permission for other transgender students to use the

---

[12]     The "new frontier" argument is curious given that Martinsville conceded that at least at its high school, there are transgender students allowed to use the restrooms of their gender identity, not their sex assigned at birth. To the extent that anything must be "navigated," it appears that Martinsville has done so.

restroom of their identified gender, and it has presented no evidence of problems when other transgender student[s] have used restrooms consistent with their gender identity." *Id.*[13]

C.      The public interest supports the issuance of the preliminary injunction

Martinsville contends that the public interest is disserved by the issuance of an injunction as it argues Title IX allows the discrimination imposed here, and it complains that *Whitaker* displaced congressional and administrative action and decision making. (Appellants' Br. at 32-34). But, as explained in *Whitaker,* this issue has already been decided by Congress. Title IX does not allow this discrimination. The public interest is furthered by supporting A.C.'s rights that are protected by the Constitution and Title IX. *See, e.g., Dodds*, 845 F.3d at 222 (denying a stay pending appeal of an injunction requiring a school district to allow a transgender student to use the female restrooms and noting that the "public interest weighs strongly against a stay of the injunction. The district court issued the injunction to protect Doe's constitutional and civil rights, a purpose that is always in the public interest.").

## Conclusion

For the foregoing reasons, the district court's decision granting A.C. a

---

[13]      In *Whitaker,* this Court concluded that the school district had failed to establish that any harm—either to the school district or to the public—would result from the issuance of a preliminary injunction. 858 F.3d at 1054. The court credited the statements made by *amici*, school administrators from twenty-one states and the District of Columbia, who "uniformly agree that the frequently-raised and hypothetical concerns about a policy that permits a student to utilize a bathroom consistent with his or her gender identity have simply not materialized. Rather, in their combined experience, all students' needs are best served when students are treated equally." *Id.* at 1055

preliminary injunction must be affirmed so that he can use the restrooms associated

with his gender identity.

/s/ Kenneth J. Falk

Kenneth J. Falk
*Counsel of Record*
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
spactor@aclu-in.org

Megan Stuart
Indiana Legal Services
214 S. College Ave., 2nd Floor
Bloomington, IN 47404
812/961-6902
Megan.stuart@ilsi.net

Kathleen Bensberg
Indiana Legal Services, Inc.
1200 Madison Ave.
Indianapolis, IN 46225
317/631-9410
fax: 317/269-7219
Kathleen.bensberg@ilsi.net

Attorneys for Appellee

**Certificate of Word Count**

I hereby certify that this brief complies with the type-volume limitation of Circuit Rule 32(c) insofar as it contains 13,342  words, excluding the parts of the brief exempted by Appellate Rule 32(f).

_/s/ Kenneth J. Falk_
Kenneth J. Falk
Attorney at Law

**Certificate of Service**

I hereby certify that on the 26th day of July, 2022, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Service will be made on all ECF-registered counsel by operation of the Court's electronic system.

_/s/ Kenneth J. Falk_
Kenneth J. Falk
Attorney at Law

STATE OF INDIANA       )          IN THE MONROE CIRCUIT COURT VI
                              )SS:
COUNTY OF MONROE    )         CASE NO. 53C06-2205-MI-000898

IN RE THE CHANGE OF GENDER OF

A█████ C█████,
        Minor Child

## <u>ORDER ON VERIFIED PETITION FOR CHANGE OF GENDER</u>

       On June 27, 2022, the Court held a hearing on the Verified Petition for Change of Gender. Petitioner, M█████ C█████, appeared with the minor child, A██ C███, and with counsel, Megan Stuart. Witness was sworn and evidence presented. The Court, being duly advised, now finds and orders as follows:

1. The Child's current legal name is A█████ C███. Formerly, the Child's legal name was ████████████.

2. The Child's date of birth is ████████████.

3. The Child uses masculine pronouns and identifies as male.

4. The current sex/gender designation on the Child's birth certificate is female.

5. The Child wishes to have his gender marker changed on his birth certificate.

6. Mother and Father consent to the change of gender marker.

7. It is in the Child's best interests to have his gender marker changed. In making this conclusion, the Court has considered the following factors based on the evidence presented:

    a. The age and sex of the child: The child is thirteen years of age and is a student in middle school. He identifies as male.

    b. The wishes of the child's parent or parents: Both parents have consented to the gender change.

    c. The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age: The Court recognizes the testimony of the child, though the Court is not required to consider A██'s desires. A██ began to question his gender identity as early as eight years old, and began to identify as a male socially at age 11. He believes that the gender marker will help him a lot, especially at school, where he is "outed" by fellow students. When asked what he

thought would happen if he was not allowed to change his gender marker, A█ expressed that he would not want to live.

d. The interaction and interrelationship of the child with:
   (A) the child's parent or parents;
   (B) the child's sibling; and
   (C) any other person who may significantly affect the child's best interests:  At home, A█'s family affirms his gender identity as male.  His parents are both supportive of his identity.  During the summer particularly, he has typically good days, and his level of anxiety is decreased.

e. The child's adjustment to the child's:
   (A) home;
   (B) school; and
   (C) community:  A█'s family has observed that school is particularly difficult, as that is an environment that does not recognize his gender identity. He is withdrawn, angry, and isolates himself.  His school life is the biggest challenge of his life; he is teased and bullied, and teachers do not support his preferred pronouns. He has not been able to play sports or use the bathroom designated for males.  He is very isolated.  A change of gender marker on the birth certificate would alleviate some of those problems.  At the very least, it would require school officials to recognize his gender and allow A█ to gain access to preferred bathrooms and pronouns.

f. The physical and mental health of all individuals involved:  The Court herein adopts the opinions of Dr. James D. Fortenberry, who has provided gender affirming medical treatment to children, and has reviewed A█'s medical history.  A█ meets diagnostic criteria for gender dysphoria in an adolescent.  He confirmed that A█ has identified significant distress, depression, and anxiety in association with misperceptions of his gender, which is consistent with A█'s testimony.  A█ has received therapy to assist with his distress, particularly, supportive counseling, counseling for safe chest binding, and hormonal suppression for menstrual periods. The accepted treatment for individuals experiencing gender dysphoria are aimed at alleviating the distress associated with the "incongruence between gender identity and birth assigned sex".  That treatment involves allowing the individual to express their identity through name and preferred pronouns, with dress and social behaviors consistent with their experienced gender, along with counseling and supported social transitioning.  As noted above, A█ expressed that he experiences the most distress when at school, at which he is not free to express his experienced gender, and has indicated a feeling of hopelessness and lack of will to live if he is not given the opportunity to fully express his gender identity with his gender marker change.

8. The parents of the Child have the authority to proceed with the Petition.

**IT IS THEREFORE ORDERED** that the Petition for Change of Gender is **GRANTED**, and the Child's gender as designated on his birth certificate shall be changed to **Male.**

**IT IS FURTHER ORDERED,** that all agencies, institutions and offices issuing the minor identity documents or holding records related to the minor are directed to amend such documents consistent with this order, including but not limited to the Indiana State Department of Health and its subdivisions.

**SO ORDERED,** **July 22, 2022**

Holly M. Harvey
Judge, Monroe Circuit Court

OFFICIAL CERTIFIED COPY
July 25, 2022
TRUE AND COMPLETE
CLERK OR DEPUTY
CLERK OF THE CIRCUIT COURT
MONROE
AA

DISTRIBUTION:
Petitioner
File/RJO